JAMES YOUNG V. STATE OF NEBRASKA.

FILED SEPTEMBER 20, 1905.    No. 14,119.

1. **Homicide.** Where one is assailed in his home or domicile, or the home is attacked, he may use such means as are necessary to repel the assailant from the house, or prevent his forcible entry or material injury to the home, even to the taking of life; but a homicide in such a case would not be justifiable, unless the slayer, in

the careful and proper use of his faculties, *bona fide* believes, and has reasonable ground to believe, that the killing is necessary to repel the assailant or prevent his forcib.e entry.

2. **Domicile.** A box stall at a fair ground provided with inside fastenings to its doors, which is prepared and used by a man as his office and sleeping apartment, the place where he resides, he having no other place of abode, and which contains his clothing, his money, and all of his belongings, is in legal effect his home or domicile.

3. **Murder: DEFENSE: INSTRUCTIONS.** Where a defendant charged with the crime of murder admits the killing, defends his action as justifiable in defense of his person and his domicile, and introduces competent evidence tending to establish his theory of the homicide, he is entitled to have the jury instructed on the law of such defense.

4. **Criminal Law: INSTRUCTIONS.** It is the duty of the trial judge, particularly in criminal actions, to instruct the jury as to the rules of law governing the disposition of the cause, whether he is requested to do so or not; and if a charge to a jury, by omission to instruct on certain points, in effect withdraws from their consideration an essential issue of the case, it is erroneous.

ERROR to the district court for Lancaster county: EDWARD P. HOLMES, JUDGE. *Reversed.*

*R. D. Stearns, W. W. Towle* and *W. P. McCreary,* for plaintiff in error.

*Norris Brown, Attorney General,* and *William T. Thompson, contra.*

BARNES, J.

James Young, who will hereafter be called the accused, was tried in the district court for Lancaster county on an information charging him with murder in the first degree for the killing of one Samuel Winter. He was found guilty of murder in the second degree, and was sentenced to imprisonment in the state penitentiary for a term of fifteen years, and from that sentence he prosecutes error.

It appears from the evidence that the accused was located at the State Fair grounds, near the city of Lincoln,

during the summer of 1904, and there had charge of some
trotting horses owned by one Brownell; that he was
authorized to employ assistants, and had full power to
discharge them; that he prepared one of the stalls at the
grounds for, and used it as, his office and sleeping apart-
ment, having provided its doors with inside fastenings,
consisting of hooks and staples; that during the summer,
and up to about the 1st of September, he had in his serv-
ice Max Wagner, Samuel Winter (the deceased), and a
colored man of the name of Milt Basil. It further appears
that on or about the last day of August he discharged
Winter, and on the evening of September 1st met him in
the city of Lincoln, and paid him his wages, giving him
$4 more than was his due; and the deceased at that time
declared his intention to go to Denver, Colorado. The
accused thereafter returned to the fair grounds in com-
pany with one John Wright, arriving there about mid-
night. After drinking some coffee at a lunch counter, he
went to the stalls where the horses which he had charge of
were kept, and ascertained that they had not been prop-
erly cared for. For this neglect he found some fault with
Wagner and Basil, but no serious difficulty occurred be-
tween them. He then went to his sleeping apartment. He
claims that before going to bed he heard some persons,
whom he recognized by their voices as Wagner and the
deceased, talking about "doing him up," as he expressed
it. He thereupon went down the line of stalls to where
one Vorhees was lying on a cot, and told him not to go
to sleep, as he feared there would be trouble. He then
returned to his apartment, placed his revolver under his
pillow, undressed, and went to bed. Shortly afterwards,
and about two o'clock on the morning of September 2d,
Wagner and the deceased forced open the doors and en-
tered the stall where the accused was sleeping. The evi-
dence is conflicting as to what was there said and done
by them. The accused, however, admits that he seized
his revolver and fired three shots at them, or in their
direction, with the result that Wagner was wounded in

the arm, and the deceased was shot in the hip, the ball entering the abdomen, thus giving him a wound which caused his death. At the trial it was the theory of the defense that the accused was justified in firing the fatal shot in defense of his domicile and his person, and at the conclusion of the testimony he tendered certain instructions fairly submitting that defense to the jury, and requested the court to give them. They were refused, and he excepted to such refusal. It further appears that the court failed to instruct the jury on the law of this theory of the defense on his own motion, and such refusal and failure to instruct are now assigned as grounds for a reversal of the judgment of the trial court.

It is well settled in this state that it is the duty of the trial judge, particularly in criminal actions, to instruct the jury as to the rules of law governing the disposition of the cause, whether he is requested to do so or not; and if a charge to a jury, by omission to instruct on certain points, in effect withdraws from the consideration of the jury an essential issue of the case, it is erroneous. *Pjarrou v. State,* 47 Neb. 294; *Dolan v. State,* 44 Neb. 643; *Long v. State,* 23 Neb. 33. The first question, then, for us to determine is: Was the stall or apartment occupied by the accused in a legal sense his domicile at the time he fired the fatal shot?

It appears from the evidence that the accused was a single man, and it was not shown that he had any home or place of abode other than the one where the tragedy occurred. The evidence also shows that he came there with Brownell's horses early in the spring of 1904 and had lived there continuously from that time until the shooting took place; that he had fixed up box stall No. 47 for his office and sleeping room, and had put inside fastenings on the doors; that he had therein his bed, his trunk, all of his clothing, his money, and the harness, boots and other things used by him in training and racing the horses which were in his charge. In fact, it was the only home he had. It was the place where he lived, his

only place of residence. Text writers, so far, have been unable to agree upon a legal definition of the word "domicile," or rather as to what is a man's domicile. We find, however, in 14 Cyc. 834, a quotation from *Smith v. Croom,* 7 Fla. 81, defining the word as follows:

"We like this conception of the word *home,* which constitutes the commanding element of the definition given in the Roman law, as well as those given by two modern jurists. It is the word whose essential meaning comes up fully to our idea of domicile. It is a word which admits not of qualification. To speak of a *permanent* home is to perpetrate a tautology. To speak of a *temporary* home is to involve a contradiction of terms. It is a word which finds its true interpretation in the instincts of our nature. It is a word the full meaning of which is of universal application; it is understood alike by the degraded savage and the classic Greek—by the republican serf and the refined Roman. Wherever that spot is found, there the law fixes the domicile."

This definition seems to be a reasonable one, and it fully meets with our approval. The word domicile or dwelling has, in cases like the one at bar, received a most liberal construction. In *Pond v. People,* 8 Mich. 149, a building 36 feet distant from a man's house, used for preserving nets employed in the owner's ordinary occupation of a fisherman, and also as a permanent dormitory for his servants, was held to be in law a part of his dwelling or domicile. So, bearing in mind the rule "that no man shall be deemed to be without a domicile" (14 Cyc. 836), we are of opinion that the place where the shooting occurred was, within the meaning of the law, the domicile of the accused.

This brings us to the question: Was there competent evidence introduced on the trial tending to show that the accused killed the deceased in defense of his person and his domicile? The defendant was sworn and testified in his own behalf, in substance, as follows: "And after I went to bed I laid quite a while, and I knew Max was

drinking, and I knew his disposition when he was drinking; he was notoriously bad tempered. After a while I thought it was just more talk than anything else, so I covered up, and was just about half asleep, and they came around to the door. I heard some one speak. I woke up and lit the lantern, and some of them was over against the door. I said: 'Whoever that is, go away from the door.' And just at that the door was jerked open. The foot of my cot came right up to the door, like this (indicating). Here is the door, here (indicating). Here was my cot (indicating). And Wagner said: 'You s—— of a b——, here is the man that said you was going to fire all of us Friday.' I said: 'Max, so far as you are concerned, you come around tomorrow, when you are sober, and I will talk to you.' I said: 'I have settled with Sam, and have nothing to say to him.' He said: 'You s—— of a b——, I will cave your head in with this lantern.' Sam made the remark: 'I will cut your guts out and hand them to you.' When he made his first remark, 'We come to do you up,' I shot right through the door. I said: 'Now, Max, you had better go out.' He raised the lantern. I turned over again, and shot in his direction, and was getting out of bed. I shot three shots. After I shot the third time, Max turned and ran out. Sam went to the door, I got out of bed. I said: 'Now, Sam, get out of here, you are coming around to cause trouble after I discharged you.' I said: 'Now, Sam, I have always used you right in every way.' He said: 'Yes.' I said: 'I have tried to use you like a man, and give you the easy side of it since you have been at work, and you come around now and make a disturbance.' He turned and walked around the barn. That was the last I seen of him. I didn't know at that time that I had shot Winter."

The testimony of witnesses Carter and Towle in a measure corroborates the foregoing statements. They both testified that Wagner said to them: "We went there to get even with that d——d nigger by giving him a good pounding, and we got the worst of it." It is true that

Wagner tells a different story as to what occurred after
he and deceased forced open the stall door. And Winter,
in his so-called dying declaration, said nothing about
threats or hard words at the time the shooting occurred.
With these conflicting statements in evidence, it was for
the jury to determine who of the witnesses was entitled to
the most credit, and which of them should be believed;
and it was error for the court, by refusal to instruct, to
ignore any part of the evidence. So we are satisfied that
there was sufficient evidence introduced in support of de-
fendant's theory of the homicide to require the court to
submit it to the jury by proper instructions.

Where one is assailed in his home, or the home is at-
tacked, he may use such means as are necessary to repel
the assailant from the house, or prevent his forcible entry
or material injury to his home, even to the taking of life;
but a homicide in such a case would not be justifiable, un-
less the slayer, in the careful and proper use of his facul-
ties, *bona fide* believes, and has reasonable ground to be-
lieve, that the killing is necessary to repel the assailant
or prevent his forcible entry. *State v. Peacock,* 40 Ohio
St. 333; *Marts v. State,* 26 Ohio St. 162; *Pond v. People,*
8 Mich. 149; *Brown v. People,* 39 Ill. 407. The instruc-
tions asked for by the accused embodied the foregoing
principle in apt and suitable language, and yet the court
refused to give them, and failed to so instruct on his own
motion. That this was reversible error there can be no
question.

Many other assignments of error are ably presented by
counsel for the accused, which we decline to consider, be-
cause a new trial must be granted for the error above
mentioned; and it is to be presumed that the district court
will correctly determine all questions which may arise
on the next trial of the accused.

For the refusal to give the instructions asked for on an
essential issue of the case, the judgment of the district
court is reversed and the cause is remanded for a new
trial.

REVERSED.