## STATE vs. SORRENTINO

(No. 1181, March 25th, 1924; 224 Pac. 420.)

CRIMINAL LAW—HOMICIDE—DEFENSE OF HABITATION DOES NOT IN-
CLUDE RIGHT TO KILL IN ABSENCE OF NECESSITY—BURGLARIOUS EN-
TRY ALONE IS NOT A JUSTIFICATION TO KILL—SELF DEFENSE—
MALICE—WORDS AND PHRASES—INSTRUCTIONS—EVIDENCE—MIS-
CONDUCT OF PROSECUTOR—MODIFICATION OF JUDGMENT ON APPEAL—
INDICTMENT AND INFORMATION—MANSLAUGHTER.

1. Defendant, who was occupying a room in a building as a bedroom at the time of the homicide, had a right to protect it as against trespassers, and was not required to retreat regardless of whether he had leased the building.

2. The right to protect one's habitation does not give one a right to kill another unless necessity, or apparent necessity, for purpose countenanced by law exists.

3. A man has a right to prevent the commission of a felony in his home or the infliction on any one of its inmates of a personal injury which may result in loss of life, or great bodily harm; but the right is limited to prevention, and does not extend to punishment for an act already committed.

4. A person has no right to kill another who entered his home for the purpose of burglary merely because of the burglarious entry.

5. A defendant was not justified in killing deceased on the ground of self-defense if a cautious and prudent man under the same circumstances would not have believed the danger to have been real.

6. In a prosecution of a defendant who shot deceased when deceased opened defendant's bedroom and threw a flash-

light on defendant during the nighttime, the question whether defendant was justified in believing that he was in danger, so that self-defense was available, *held* for the jury.

7. In its popular sense, the term "malice" conveys the meaning of hatred, ill will, or hostility toward another; but such is not its legal meaning, and the term, within the definition of manslaughter in the second degree as homicide committed with malice, implies a wicked condition of mind while homicide is committed.

8. In prosecution of a defendant who shot deceased after the latter had opened the door of his bedroom during the night and flashed a flashlight at defendant, evidence *held* insufficient to sustain finding that defendant killed deceased with malice, so that the crime was murder in the second degree and not manslaughter.

9. In a prosecution, in which the defendant claimed to have acted in self-defense, instruction on self-defense *held* not erroneous for failure to charge jury on doctrine of apparent danger, in view of other instructions fully and clearly stating such doctrine.

10. Where the state claimed as against defendant's plea of self-defense that the building in which the defendant shot deceased was not defendant's home, but was a place in which moonshine was being manufactured, testimony as to the condition and contents of the house immediately after the homicide, disclosing that there was a smell of illicit distilled whisky therein, *held* admissible as against the objection that it tended to show a distinct crime.

11. In a prosecution for murder, prosecuting attorney's act in asking defendant as to when he had paid a fine for moonshining *held* misconduct.

12. In prosecution for murder, misconduct of prosecuting attorney in asking defendant when he had paid a fine for moonshining *held* not ground for reversal, in view of other evidence from which it was apparent that jury's verdict was not materially affected thereby.

13. Under Comp. St. 1920, § 7589, providing for proceedings in Supreme Court to vacate, "modify," or annul judgment, the Supreme Court, on appeal from judgment of conviction for murder in second degree, could modify the judgment so as to convict defendant of manslaughter, in view of section 7591, since verdict of murder in the second degree necessarily implied the finding of all of the facts essential to the offense of voluntary manslaughter.

14.  Manslaughter, though a distinct crime from that of mur-
der, is included in the crime of murder.

APPEAL from District Court, Laramie County, WILLIAM
A. RINER, Judge.

Mike Sorrentino was convicted of murder in the second
degree, and he appeals.

*William C. Mentzer* for Appellant.

Defendant was not proven guilty of either manslaughter
or murder, the Court should have directed a verdict for de-
fendant, the court erred in submitting instructions on first
and second degree murder and manslaughter, the evidence
did not sustain either; Palmer v. State, 9 Wyo. 40, 59 Pac.
793; DeLaney v. State, 14 Wyo. 1, 81 Pac. 792; 2 Bishop
Crim. Law, 636; Armstrong v. State, (Okla.) 143 Pac. 870;
Sewell v. Derricott, 161 Ala. 259, 18 Ann. Cas. 636; the evi-
dence is insufficient to sustain a verdict of guilty, Willsman
v. U. S. 286 Fed. 852; Sullivan v. U. S. 283 Fed. 686; Union
Coal Co. v. U. S. 173 Fed. 740; the Court erred in permit-
ting the admission of evidence of liquor found in the house
prior to the shooting, Watson v. Com., 119 S. W. 288; State
v. Teeter, 144 S. W. 447; Little v. State, 105 S. E. 359;
Martin v. Com., 245 S. W. 869; People v. Watson, 133 Pac.
298; People v. Harris (Mich.) 182 N. W. 673; Baldwin v.
State, (Okla.) 144 Pac. 634; People v. Gengels, (Mich.)
188 N. W. 398; People v. Bush, (Ill.) 133 N. E. 201; the
court erred in the admission of evidence procured by an un-
lawful search of defendant's premises, Peterson v. State,
(Wyo.) 194 Pac. 342; People v. Ball, 198 N. Y. S. 332; the
prosecutor was guilty of misconduct in his interrogation of
defendant as to when he had been fined at Rawlins for
moonshining, Com. v. Gibson, 119 Atl. 403; Martin v. Com.,
245 S. W. 869; Steele v. Com., 245 S. W. 646; Rogers v.
State, 127 Pac. 365; Meno v. State, 83 Atl. 759; State v.
Teeter, 144 S. W. 445; the instructions on self defense did
not cover the defense of home or habitation, Foster v. Shep-
herd, 101 N. E. 411; State v. Perkins, 91 Atl. 265, L. R. A.

1915A 73; Armstrong v. State (Okla.) 144 Pac. 870; 1
Wharton C. L. 503; Ross v. State 10 Tex. App. 445; Brown
v. State, 222 S. W. 252; an entry to steal whisky is bur-
glary, Ellis v. Com., 217 S. W. 368; Smith v. State, (Ind.)
118 N. E. 954; State v. May, 20 Ia. 305; Com. v. Smith, 129
Mass. 104; Bales v. State, 3 W. Va. 685.

*David J. Howell,* Attorney General for Respondent.

Defendant admitted that he heard the intruders trying to
effect an entry but remained silent; he was not justified in
killing without attempting to frighten them away, Steel v.
Scheele, 57 Conn. 307, 18 Atl. 256; the evidence showed
malice, Hall v. State, 168 S. W. 1122; Palmer v. State 9
Wyo. 49; the building was not defendant's home; he was
in fact rooming at 118 West 11th street according to the
evidence; the premises where the homicide occurred was
used for the illicit storage and sale of moonshine; the rule
of defense of home and habitation does not apply, State v.
Smith, 69 N. W. 269; the evidence as to the contents of the
house was necessary to rebut defendant's claim that it was
his home; proof of other crimes is admissible where relevant
in establishing defendant's guilt, 16 C. J. 588; Horn v.
State, 12 Wyo. 80; Hill v. State 194 Ala. 11; Walsch v. Call,
32 Wis. 159; instruction number 25 reviewed by the Court
was defective in stating that one might take life for any in-
trusion of his home regardless of the question of necessity;
if evidence tending to show that defendant was dealing in
moonshine was properly admitted, the prosecutor's ques-
tion as to when defendant had been fined for moonshining
was not misconduct; defendant did not request an instruc-
tion as to his right to protect his liquor from burglary.

*William C. Mentzer* in reply.

Defendant was not lying in wait, he was frightened by the
intruders and was afraid they would kill him. They ordered
him to throw his hands up; the evidence established that
defendant had roomed on 11th street until December 1st,
and then moved to the cement house, Hall v. State is not in

point, as in that case deceased was not attempting to enter. Whether defendant had "moonshine" in his house would not effect his right to defend his person and habitation, Russell v. State, 54 So. 360; State v. Kennade, 26 S. W. 347; the occupant of a dwelling house may defend his habitation against an attempt of felony about to be committed therein, even to the extent of taking life of the intruder, State v. Perkins, (Conn.) 91 Atl. 265; State v. Mills, (Pa.) 69 Atl. 841; Wilson v. State, (Fla.) 11 So. 556; People v. Keuhn (Mich.) 53 N. W. 721; State v. Taylor, (Mo.) 44 S. W. 785; even a box stall in which accused slept and kept his belongings is in effect his habitation, Young v. State, (Neb.) 104 N. W. 867, or a rented room, Reinke v. Com. (Ky.) 128 S. W. 314; Fortune v. Com., 112 S. E. 861; State v. Bartmess, 54 Pac. 167; State v. Terrill, 24 A. L. R. 497 and note at page 508; the court should have given instruction number 25 as to admissibility of evidence unlawfully obtained, see recent case of Gore v. State, (Okla.) 218 Pac. 545.

BLUME, Justice.

The defendant Mike Sorrentino was convicted of murder in the second degree and sentenced to the penitentiary for a period of from 35 to 40 years, and he appeals.

The homicide in question occurred about ten o'clock on the night of December 21, 1922, in a cement block house on the corner of Eleventh Street and Capitol Avenue, in the City of Cheyenne. The house faces north on Eleventh Street and has a front and a rear entrance, and a front and a rear porch. It is a one story house which has a basement to which access may be had by a stairway leading from the kitchen. Only four rooms are in the house, of almost equal dimensions. The south two rooms are the two rooms mainly concerned in this case and consist of a kitchen, on the southeast corner of the house, and a bedroom, on the southwest corner of the house. The door leading from the south porch into the kitchen is close to the west end of the latter, and swings inward from east to west; the door—and the only door—leading into the bedroom is close to the south

side of the house, swinging inward from north to south. In other words, the two doors mentioned are close to each other and in the same corner.

The decedent, one George McGough, was about 24 years of age. He and Vance Homan, a boy of about 17 years of age, met about seven o'clock of the evening of the homicide with the intention to go into the house in question for the purpose of stealing some so-called moonshine whiskey. They had been in the house on the previous Sunday, had found the door unlocked, though closed, had gone in and found nothing. It is not clear just what they did at 7 o'clock on the night in question, but they did not go in. They returned at eight o'clock, tried to enter by the rear door, but finding it locked, went away, the deceased intending to get some keys which would open the house. These keys were procured by said deceased and about nine o'clock he, in company with said Vance Homan and two other boys returned to the house. The two latter were stationed round the house as guards. The deceased and Vance Homan went on to the back porch, unlocked the door with a key and entered the kitchen. The night was dark, no light was in the house, and its windows were covered. The deceased was equipped with a flashlight, and used it to some extent in the kitchen, no doubt for the purpose of finding some whiskey. Vance Homan testified that they were in that room for perhaps two minutes. They were there, no doubt, just long enough to discover that no whiskey was to be found, and they then proceeded toward the bedroom already mentioned. It was open to the extent of five inches. Homan pushed the door open and the deceased used his flashlight, throwing it upon the face and upper part of defendant who was standing on or by a bed in the middle of the room, and who thereupon, so Homan testified, shouted "hands up" and almost immediately thereafter began to shoot. Two or three shots were fired from a shotgun, one of which struck the deceased, inflicting a wound from which death resulted soon

after. It does not appear whether Homan or deceased threw up their hands as commanded.

The defendant's testimony varied to some extent from that of the witness Homan. According to him he heard four men come onto the porch, trying two or three keys before the kitchen door opened; that he was awakened from sleep; that he dressed as soon as he heard the noise on the porch; that he was frightened; that when the bedroom door was pushed open and the flash-light thrown on him, he heard someone say ''hands up, I shoot;'' that he himself shouted ''hands up, come from me;'' that he saw the deceased with his hands back and pulling a revolver, whereupon he shot. After shooting, defendant fled precipitously to Colorado. Testimony of reputable witnesses show him to have had the reputation as a peaceable and law-abiding citizen.

The north two rooms in the house and the basement were upon examination immediately after the shooting, found to be empty. In the kitchen were only some empty glass bottles, a bushel basket, a strainer used in straining liquids, with a cloth over it that was wet. A strong odor of ''moonshine-whiskey'' was in the room. In the bedroom was a matress-pad, which had on it one comfort, two army blankets and a pillow, and had the appearance of having been occupied by some one a short time before; there was also an oil stove, then burning. The defendant claimed the house to be his home. The state, however, introduced evidence tending to show the contrary and that it was used for the unlawful purpose of the manufacture of ''moonshine whiskey.'' Among other things it was shown that a keg of five gallons of that liquid was found in the house some three or four days prior to the date of the homicide. Some of the witnesses testified that the defendant had been frequently seen going to and from the house, with baskets, gunny-sacks, grips and bags, which, whatever its object, tended to show, if nothing more, that the defendant had a right in and to the house. It may be mentioned that it seems clear that at the time of the shooting a Smith & Wesson revolver was also

used in the kitchen and a shot or shots fired therewith, one shot lodging behind the lock in the kitchen door. The circumstances appear to negative the assumption that it might have been used by the defendant. The witness Homan testified that neither he nor the deceased had the revolver, and none was found on the latter when seen after he was wounded. The incidence is shrouded in mystery; and we must, perforce, ignore it altogether in the consideration of the case.

1. Counsel for defendant insists that the evidence is not sufficient to sustain the verdict; that it is undisputed that deceased entered the house burglariously, for the purpose of committing a felony therein; that defendant had a right to protect the house as his home and had a right to prevent the commission of such felony therein. The state claims that the house in question was not defendant's home, and we are cited to Hill v. State, 194 Ala. 11, 69 So. 941, 2 A. L. R. 509. In that case, it seems, defendant killed deceased in an illicit distillery, used for nothing but the unlawful purpose, and it was held that defendant had no right to be there, and that hence it was his duty to retreat when attacked. We do not think that we can apply the doctrine of that case to this. The testimony in the case all tends to show that the defendant, even though he had not leased the home himself, had the right to be there at least as against trespassers. The house had four rooms. Even though part of it was used for the purpose of manufacturing illicit liquor, it would seem to be a dangerous doctrine to go to the extent of holding that by reason of that fact alone the house became an unlawful resort for all purposes, depriving a man of the right to sleep or dwell therein or stand his ground in case of attack; for, carried to its logical conclusion, such doctrine would compel the owner of the most sumptuous home who permits nature to do therein its perilous work in producing an unlawful, alcoholic content in beverages, to flee therefrom if attacked. Even in the case relied on by the state, the court stated that while one's house formerly meant his

home, his dwelling, the rule has also been extended to one's place of business or his place of refuge; that consequently, a man's place of business must be regarded *pro hac vice* his dwelling. In Russell vs. State, 61 Fla. 50; 54 So. 360, and State vs. Kennade, 121 Mo. 405; 26 SW. 347, a house of prostitution was held to come within the meaning of a home or castle. A box stall at a fair ground (Young vs. State, 74 Neb. 346; 104 NW 867; 2 L. R. A. NS. 66), a tent (State vs. Halbrook, 98 Or. 43, 188 Pac. 947), 192 Pac. 640, 193 Pac. 434 a root house (People vs. Coughlin, 67 Mich. 466, 473, 35 N. W. 72), an office (Morgan vs. Durfee, 69 Mo. 469), 33 Am. Rep. 508, a room rented and occupied as a bedroom (Harris vs. State, 98 Ala. 24, 11 So. 255), and other like places, have been held *pro hac vice* to be a man's home, which the occupant has a right to defend and from which, in case of attack, he need not retreat. 30 C. J. 83. It is not necessary, as will appear more clearly hereafter, to determine the rights of defendant in the house in question as a whole, but he used one of the rooms as a bedroom on the night of the homicide; he occupied it lawfully as against trespassers, and we can see no good reason to hold, why, as to such trespassers, he should be compelled to retreat if attacked. We think that this room at least, was for the time being, his home and his castle, which, at least as against trespassers, he had a right to defend and from which, if attacked, it was not his duty to retreat.

But the right to kill is based upon the law of necessity or apparent necessity. Life may be snuffed out in the fraction of a second, but can never be restored. The doctrine of the right to protect one's habitation gives no moral right to kill another, unless necessity or apparent necessity, for purposes countenanced by law, exists. So much has been written upon the subject under consideration that we need but refer to Palmer vs. State, 9 Wyo. 40, 45, 59 Pac. 793, 87 Am. St. Rep. 910, and cases collected in the notes in 67 L. R. A. 529; 2 L. R. A. (N. S.) 66; 25 A. L. R. 508. A man has a right to prevent, in his home, the commission of a felony or

the infliction on any of its inmates of a personal injury
which may result in the loss of life or in great bodily harm.
The right is limited to prevention; it does not extend to
punishment for an act already committed. Note 67 L. R. A.
547, 550. After the deceased had entered, though burglar-
iously, and after he was in the house, the defendant had no
right to kill him for the act of entry already committed.
Horton vs. State, 110 Ga. 739, 747, 35 S. E. 659. The evi-
dence shows that there was no property in the kitchen
worthy of stealing, and the defendant may well be held to
have known the fact. He could, therefore, have no right
to kill deceased on the pretense of preventing a felony in
that room. The right of defendant, in other words, was lim-
ited (1) to the protection of himself, (2) to prevent a felony
in the bedroom and, probably, (3) to prevent the deceased
from entering that room at all. The two purposes last men-
tioned, are, however, virtually eliminated from the case,
since the defendant testified that he shot because of his fear
of an attack on himself. In any event, he does not claim
that he feared anything else or shot for any other reason.
He was not justified in shooting unless there was actual or
apparent danger of loss of life or of sustaining great bodily
injury. Leach vs. Com. 129 Ky. 497, 112 SW. 595. The
witness Homan testified that the deceased had no gun and
this is corroborated by the fact that none was found upon
the latter after he was shot, and the jury were, we think,
justified in disbelieving the testimony of the defendant that
he saw deceased reach for a revolver. The question, there-
fore, is narrowed down to the proposition as to whether or
not the opening of a door, and the throwing of a flash light
upon the defendant, was an attack upon the latter, which,
under the circumstances of the case, was of itself sufficient
to create in the mind of defendant, as a reasonable man, an
honest belief that the danger to him was imminent and that
the action which he took was necessary for the purpose of
protecting himself from loss of life or infliction of great
bodily injury. If a cautious and prudent man under the

same circumstances would not believe the danger to have been real, then the defendant cannot be said to have been justified in his action. We think that the determination of that question in the case at bar was preeminently for the jury under proper instructions of the court. Ward vs. State, 75 Fla. 756, 79 So. 699; Salisbury vs. Com., 146 Ky. 730, 143 SW. 371; 30 C. J. 330.

2.   The court instructed the jury that they might find the defendant guilty of murder in the first degree, murder in the second degree and manslaughter. An exception was taken to the instruction by the defendant; and the question arises whether or not the jury were warranted in finding the defendant guilty of murder in the second degree; whether, in other words, it was warranted in finding that the homicide was committed with malice. The evidence on that point is substantially undisputed. As to what constitutes malice is not easily defined. The term was to some extent considered in Meldrum v. State, 23 Wyo. 12, 44, 146 Pac. 596, 603. An instruction had there been given in the following words: ''Malice means ill will, hatred, ill-natured, wilfulness, a wilfull intention to do an unlawful act; a wilfull act done intentionally without just cause or excuse. It also denotes a state of mind from which acts are done regardless of others.'' The instruction was said to be inelegant but not prejudicial. In its popular sense, the term malice conveys the meaning of hatred, ill-will, or hostility toward another. 29 C. J. 1084. That is not its legal meaning, but the term nevertheless implies a wicked condition of mind while the homicide is committed; a mind, we may say, committing the very act wilfully. See definitions 29 C. J. 1086. If the homicide is committed under circumstances sufficiently mitigating or extenuating, the crime is reduced to manslaughter. In Bennett v. State, 15 Ariz. 58, 136 Pac. 276, it was said:

''The legal import of the term 'malice' extends beyond and is more comprehensive than ill-will, hatred or revenge.

It includes all states of the mind under which the killing of a human being by another takes place without any cause which will in law justify or excuse it or *mitigate* the homicied to manslaughter."

Other courts, too, have adopted a similar definition. State v. McGuire, 84 Conn. 470, 80 Atl. 761, 38 L. R. A. (N. S.) 1045; Logan v. State (Tex. Cr.) 53 S. W. 694. See 29 C. J. 1086. In 13 R. C. L. 764, it is said that the term includes all those states and conditions of mind which accompany a homicide that is committed without legal excuse or extenuation. Fear or terror of such character or degree as to render the accused incapable of cool reflection has been considered as a fact in mitigation or extenuation so as to reduce the homicide to manslaughter. Wharton Crim. L. 1, p. 608; Wharton on Homicide, 271. In the last named work on p. 302 it is said:

"Likewise where a person forces his way into a dwelling house and there assaults the owner, and the owner kills him, the forcible entry and assault constitute a sufficient provocation to reduce the killing to manslaughter, where the act of killing was the result of excitement and confusion caused by the entry and assault."

The night in question was dark, the windows of the house covered; there were no lights in the house. When the footsteps of the intruders were heard upon the porch and the sound of the burglars' keys heard in the door, the defendant's heart quaked. The state insists he should have sounded an alarm; that he should have inquired whether the violent and felonious intrusion was intended for purposes innocent or otherwise, and that the failure to do so indicates that he lay in wait ready to fall upon his victim at the opportune moment. The explanation is inadequate. Defendant did not know the intruders; there is not the slightest indication in the evidence that he had cause to suspect that a raid or an attack upon his house would be made at that

time.   The suggestion that he might have expected the offi-
cers of the law to swoop down upon him, is based entirely
upon speculation instead of evidence, and would seem to
vanish into a bare possibility in view of the fact that de-
fendant had no whiskey upon his premises at that time.
The defendant says that he was frightened.   The statement
is not unreasonable.   Rudely awakened from his slumbers,
or suddenly roused up in his attempt to sleep, he imagined,
no doubt, the existence of more footsteps than there actually
were.   Some men with courageous hearts, especially if ac-
customed to have people enter their homes at various times
of the night, would no doubt have called out as the state
claims the defendant should have done, but to lay it down as
a necessary requirement in cases of a felonious entry in a
house, in the dark hours of night, in order that an owner,
lessee or occupant may escape the imputation of premedit-
ated malice in an encounter that might take place subse-
quently, is, we fear, making too great a requirement upon
the courage of men and would be based on an assumption
of bravery which, in all likelihood, the greatest portion of
humanity does not possess.   The effect upon the human
mind of darkness in the stillness of the night is a factor
well known.   Children, women, men hate to penetrate places
of darkness when the surroundings are not entirely known,
or even when fairly well known.   A sudden appearance
from out of the darkness is apt to give at least a temporary
nervous shock to the stoutest heart.   Much more is that apt
to be true when, roused from rest or slumber, on a dark
night, footsteps and other sounds are heard which are calcu-
lated, as in this case, of giving the impression of boding no
good.   We cannot take too literally the evidence as to the
number of minutes it took to open the kitchen door and
search the kitchen, only to find that no whiskey was to be
found.   The time, at best, could have been but short, and
when the bed-room door was pushed open and a flashlight
suddenly thrust upon the already excited defendant in the
darkness, by parties entirely unknown to him, and unex-

pected, it is reasonable, we think, to conclude that the effect upon him was to unnerve him, and create in his mind additional confusion, fright and terror. In fact, his sudden action thereafter bears this out. Had the bedroom door never been opened by the decedent and his companion, the fatal accident would probably never have happened. To hold that under these undisputed facts, the jury were warranted to conclude that malice was clearly shown, is, it would seem, equivalent to making the rule of reasonable doubt altogether inapplicable in such case. No malice, we think, was shown, and the jury had no right to find the defendant guilty of more than manslaughter.

3. Of the other assignments of error we shall consider those only which we think of sufficient importance to note. Complaint is made of the refusal of giving an instruction asked and of giving instruction No. 18, both relating to the right of the defendant to protect his property from an unlawful intrusion. The instruction asked is long and we shall not set it out. Suffice it to say that it includes the idea that defendant had the right to protect the whole house from unlawful intrusion; it goes too far and is not in accord with what we have already said herein. Instruction No. 18, given by the court, is as follows:

"You are instructed that the owner or tenant of a dwelling house may resist the entry thereof by another person or persons, but in so doing he has no right to kill unless it be rendered necessary to prevent a felonious destruction of his property or to defend himself against loss of life or great bodily harm. If he kills in resisting such entry, when there is not a reasonable ground of apprehension of imminent danger to his person or property, you are instructed that he would be guilty of the crime of manslaughter; and if done with malice, express or implied, you are instructed that he would be guilty of the crime of murder."

Counsel for defendant complains that the jury were not told that the defendant had a right to kill, if it appeared to

him, as a reasonably prudent man, to be necessary in order to prevent the forcible entry of his house or habitation and to prevent the commission of a felony therein; in other words, that the court ignored the doctrine of apparent danger. The last portion of the instruction refers thereto, but is stated in a negative way, and as an abstract proposition of law, the instruction is not to be commended. We have, however, already stated that the defense in this case practically rests upon the question of self-defense, with no duty, however, on the defendant to retreat. In Instruction No. 17 the jury were told that the defendant had the right to stand his ground and was not bound to retreat, if he in good faith believed and had reasonable ground to believe that the deceased intended to take his life or do him great bodily harm. In Instruction No. 13, dealing with the right of self-defense, the doctrine of apparent danger was fully and clearly stated. We do not, accordingly, think that there was any prejudicial error in giving instruction No. 18.

4. The state produced testimony to show the condition and contents of the house in question immediately after the homicide, disclosing, among other things, as stated before, that there was a smell of illicitly distilled whiskey therein. It was also shown that several days prior to the homicide some empty kegs and one keg of five gallons of ''moonshine whiskey'' were found therein by police officers. This testimony was objected to as tending to show a distinct crime and not competent or relevant. An exception was taken to the rulings of the court admitting the testimony. The defendant claimed to be the lessee of the house and to have the right to defend and protect it. The jury were entitled to know all the circumstances surrounding the homicide, and we are inclined to think that the testimony above mentioned, and other similar testimony, tended to shed light thereon, and to aid the jury in determining what a reasonable man, if placed in defendant's position, would or should have done at the time of the homicide.

5. The prosecuting attorney asked the defendant, who testified in his own behalf, as follows: "When was it you paid a fine for moonshining in Rawlins?" The question was objected to and the objection sustained. It is claimed that the asking of the question was misconduct entitling the defendant to a new trial. There can be no doubt that it was misconduct. The question assumed as an affirmative fact that the defendant had been guilty of a distinct crime not in the remotest degree connected with the crime for which the defendant was being tried. The Supreme Court of Pennsylvania in Wagner v. Hazle Twp., 215 Pa. 219, 225, 64 Atl. 405, 407 speaking of a similar situation, says:

"When an attorney in the trial of a cause willfully and intentionally makes an offer of wholly irrelevant and incompetent evidence  *  *  *  it is the plain duty of the trial judge, of his own motion, to act promptly and effectively by reprimanding counsel and withdrawing a juror and continuing the cause at the costs of the client. In no other way can justice be administered and the rights of the injured party be protected. The imposition of the costs will remind the client that he has an attorney unfaithful to him as well as to the court. The obligation of fidelity to the court which an attorney assumes on his admission to the bar is ever thereafter with him, and when he attempts to defeat the justice of a cause by interjecting into the trial wholly foreign and irrelevant matter for the manifest purpose of misleading the jury, he fails to observe the duty required of him as an attorney and his conduct should receive the condemnation of the court."

See also Com. v. Gibson, 275 Pa. 338, 119 Atl. 403; State v. Jones, 48 Mont. 505, 139 Pac. 441; 16 C. J. 892. Such misconduct cannot, however, be considered sufficient to require the granting of a new trial in all cases. It is said in Vol. 8, California Jur., Sec. 604:

"Misconduct of the district attorney in asking improper questions is ground for reversal when it results in miscarriage of justice, but not otherwise."

In the case at bar, the question insinuated defendant's connection with "moonshining." Other testimony on that point was introduced, and as we have seen, was not admitted improperly. The question now under consideration was, therefore, at most cumulative in its effect. After careful consideration of the subject, we have concluded that, in view of all the evidence in the case, it could not have had sufficient influence on the jury so as to have materially affected their conclusion in reaching a verdict of manslaughter, included in the verdict actually returned, and that the error is not a ground for a new trial in view of our holding herein that the verdict can stand only as to that charge.

6. We come then to the point as to what order to make herein. The rule laid down in 17 C. J. 370 is as follows:

"The appellate court may reverse a judgment of a lower court as to part and affirm as to part, where the legal part is severable from that which is illegal."

And again it is there said:

"Where the errors committed can be cured by a judgment for a lower grade of the offense, the appellate court may reverse on the condition that the attorney for the state refuse to consent to the entry of such a judgment."

These questions are new in this jurisdiction and we have given them careful consideration. At common law, no bills of exceptions were permitted in criminal cases, nor did the evidence or the rulings and opinions of the court form any part of the record. Schoeppe v. Commonwealth, 65 Pa. (15 P. F. Smith) 51; Middleton v. Commonwealth, 2 Watts (Pa.) 285; Sir Henry Vane's Case, 1 Levinz 68, 83 Engl. Rep. 300. The question before us could, accordingly, never

arise at common law; and hence, it would seem, that this
court has full authority under its general appellate juris-
diction to modify the judgment herein, since the legal part
is severable from the illegal part, and to affirm the part that
is legal and reverse the part that is illegal, unless we are for-
bidden to do so by statute. There was, according to some
of the courts, a common law rule of limited application, and
which, as applied in some of the cases, led to a peculiar re-
sult. It is stated in Chitty Cr. Law, 755, Hawkins, Pleas
of the Crown, 2, 655, and Blackstone 4, 393, all evidently
based on the statement of Sir Edward Coke, that when the
judgment is falsified or reversed, all former proceedings
are absolutely set aside. This rule was applied in Rex v.
Ellis, 5 Barn. & Cress. 395; King v. Bourne, 7 Adol. & Ellis,
58; McDonald v. State, 45 Md. 90 and a few others, in which
it was held that where the sentence was illegal, the proceed-
ings should be reversed and the defendant discharged, with-
out right to retry him. That rule was severely condemned
in the case of Beale v. Commonwealth, 25 Pa. 11, where it
was said:

"The common law embodies in itself sufficient reason and
common sense to reject the monstrous doctrine, that a pris-
oner whose guilt is established by a regular verdict is to
escape punishment altogether, because the court committed
an error in passing the sentence."

In the case of Longee v. State, 11 Ohio 68, decided in
1841, the court, apparently without reference to a statute,
affirmed a judgment in a criminal case so far as legal, and
reversed it so far as illegal. In State v. Bugbee, 25 Vt. 32,
the defendant was indicted and convicted upon two counts.
There was no evidence to sustain the conviction upon one
of the counts, and the court, apparently without reference
to any statute, reversed the case with direction to re-sent-
ence upon one of the counts only. In the case of State v.
Kennedy, 88 Mo. 341, the defendant was convicted for both
burglary and larceny, with which the defendant was

charged, apparently in one count. The court upheld the court of appeals in reversing the judgment as to the burglary and affirming it as to the larceny. In the case of Simpson v. State, 56 Ark. 8, 19 S. W. 99 it appears, from the dissenting opinion therein, that the statutes regulating criminal procedure in that state, with respect to the point here involved, were at that time similar to the statutes in force in this state prior to 1901; the judgment in the case as to the conviction and sentence for murder in the first degree was set aside and reduced to murder in the second degree. That, too, was done in Vance v. State, 70 Ark. 272, 287, 68 S. W. 37. In Darden v. State, 73 Ark. 315, 84 S. W. 507 the conviction for murder in the second degree was reduced to manslaughter. In the case of Jones v. State, 88 Ark. 579, 115 S. W. 166 a conviction for murder in the second degree was set aside, but the judgment affirmed as to manslaughter, unless the Attorney General should elect to take a new trial, in which event the judgment should stand reversed. Similar action was taken in State v. McCormick, 27 Iowa, 402; Com. v. Lawless, 103 Mass. 425; People v. Farrell, 146 Mich. 264; 109 N. W. 440; People v. O'Callaghan, 2 Ida. 156, 9 Pac. 414, although a statute giving authority to modify a judgment is cited in three of the cases. Turning now to the statutes of this state we find that in 1869 the legislature provided for writs of error in criminal cases to be allowed on application to the supreme court or judge thereof. No provision was made as to what order should be made, upon final hearing, in cases of conviction for a felony not involving capital punishment. Sec. 190 c. 64, Session Laws 1869, p. 501. That section was amended by Sec. 3, Ch. 37, Sess. Laws of 1884, and it was provided that

"upon hearing such writs of error, either in felonies or misdemeanors, the supreme court shall order the prisoner to be discharged, a new trial to be had, or if the judgment against the defendant be affirmed, the supreme court shall order the original judgment to be enforced."

Thus the law stood until 1901 when provision for a writ of error, previously allowed only .on application, for good cause shown, was left out, and the legislature provided:

"In all criminal cases after final judgment and within one year after the rendition of the judgment, proceedings to vacate, *modify* or annul such judgment may be begun in the supreme court by petition in error in the same manner as is provided for taking civil cases to the Supreme Court under the laws of this state." Sess. Laws. 1901, C. 63; W. C. S. 1920, § 7589.

Here was clearly evinced a purpose to grant the court power to modify judgments in criminal cases. The quoted part of the law of 1869, amended in 1884, as above set forth, was at the same time amended to read as follows:

"and upon the hearing of such case and the determination thereof, the supreme court shall order the prisoner to be discharged, a new trial to be had, or the original judgment to be enforced, as *the nature of the case may require.*" Sec. 3, Ch. 63, Sess. L. 1901; Sec. 7591, C. S. 1920.

The last clause, "as the nature of the case may require," may be construed to refer only to one of three things, namely, that the court may (1) discharge the defendant, (2) grant a new trial, or (3) enforce the original judgment as, and only as, it was rendered in the lower court. This construction is, however, not commensurate with the right to take the appeal as granted by the same act of legislation, Sec. 1, Chap. 63, Sess. L. 1901, now Section 7589, W. C. S. 1920, and would leave the word *modify* in that section without any meaning whatever. Section 7591, on the other hand, may be construed to mean that this court has power to order "the original judgment to be enforced, as the nature of the case may require;" that is to say, to the extent that the justice of the case may require. This construction gives full force to the word "modify" in Sec. 7589, supra, and must, accordingly, be the construction that should be

adopted, giving this court full power to modify any judgment. This power should, of course, not be exercised where an error in the record is one which had deprived a defendant of a fair trial throughout, prejudicially affecting the conviction for any crime at all, and it may well be that the power can be exercised only in a comparatively few cases. We think, however, that in view of all of the evidence in this case, it is properly exercised in the case at bar. Manslaughter, though it may be a distinct crime from that of murder, is, nevertheless, included in the latter. State v. QuanSue, 191 Ia. 144, 179 N. W. 972, 976; People v. Farrell, 146 Mich. 264, 274; 109 N. W. 440; Com. v. McPike, (Mass.) 3 Cush. 181, 50 Am. Dec. 727. The verdict of murder in the second degree necessarily implies the finding of all of the facts essential to the offense of voluntary manslaughter, and the defendant has had the benefit of a trial for that offense as fully as though the information herein had contained that charge only. The verdict is, as we have seen, excessive and should be treated as illegal as to such excess, but as to such excess only.

We do not desire to be arbitrary herein and direct absolutely what shall be done, but prefer, in this particular case, to make a conditional order. The state accordingly may elect by writing filed in this court within thirty days to take a new trial, in which event the judgment will be reversed and the cause remanded for a new trial. Unless that is done, the judgment will be reversed as to murder in the second degree and affirmed for manslaughter and the case remanded to the district court with direction to cause the prisoner to be brought before it to be re-sentenced for that crime, taking into consideration the time already served by the defendant, and to make all other necessary orders not inconsistent herewith.

POTTER, Ch. J., and KIMBALL, J., concur.

NOTE—See 16 C. J. p. 892; 17 C. J. pp. 299, 366; 29 C. J. pp. 1084, 1085; 30 C. J. pp. 63, 72, 80, 83 (1925 anno), 84, 85, 201, 292, 330; 31 C. J. p. 858.