(October Term, 1940)

---

## STATE v. SCHLOREDT

(No. 2167; March 18, 1941; 111 Pac. (2d) 128)

2

For the appellant, there was a brief by *James T. McGuckin* of Sundance and *John T. Milek* of Sturgis, South Dakota, and oral argument by *Mr. Milek*.

For the respondent, there was a brief by *Ewing T. Kerr,* Attorney General; *Harold I. Bacheller,* Deputy Attorney General; and *Arthur Kline,* Assistant Attorney General, all of Cheyenne, and an oral argument by *Mr. Bacheller.*

BLUME, Justice.

An information was filed in the district court of Crook County, in this state, on October 25, 1939, charging the defendant with an assault, and with an assault and battery, upon one Glen Cameron with intent to commit first degree murder. He was convicted by the jury, in a verdict returned in court on November 1, 1939, after trial, of aggravated assault and battery, and was sentenced by the court to a term in the Crook County jail for a period of six months, and to a fine of two hundred dollars. The defendant has appealed. Glen Cameron will hereafter be referred to as the complaining witness or as Cameron.

Section 32-210, Rev. St. 1931, provides:

"Aggravated Assault and Battery. If any person shall unlawfully and maliciously inflict upon another person, either with or without any weapon or instrument, any grievous bodily harm, or shall unlawfully or maliciously cut, stab or wound any other person, the person so offending shall be fined not more than one thousand dollars, or confined in the county jail not more than one year, or both."

▉ Defendant assigns as error that the evidence is not sufficient to sustain the verdict, especially that it is not sufficient to show that the assault and battery herein was committed unlawfully or maliciously. One fundamental defect in the argument advanced in this court in the brief of his counsel is the fact that it assumes as true the testimony on behalf of the defendant, when in fact it is contradicted by the evidence on behalf of the state, which the jury had a right to believe. Counsel know, of course, how useless such an argument, based on such assumption, is in this court,

and we might well, and should, dismiss the assignment of error mentioned, without discussing it. But, without going into details, we shall mention some of the salient facts. It appears that the defendant was, on June 5, 1939, at the time when the crime charged is said to have been committed, in possession and control of the SW/4SE/4, and the S/2SW/4 of Section 34, T. 53, R. 62, Crook County, Wyoming—lands running approximately ¾ mile along the south boundary of the foregoing section, formerly owned by one Linch, but in defendant's possession since about 1932. Eastward lived Glen Cameron, the complaining witness. Westward was school land, leased to one Roy Cameron, associated in the cattle business with the complaining witness. About 1932 the defendant and Roy Cameron had an agreement under which the defendant was given the right to use the school land, in return for the use by Roy Cameron of some land which the latter had plowed up on defendant's land. According to the evidence on behalf of the state, this agreement was terminated in the fall of 1938. Defendant denied that. However, the lease was assigned to one Harper in March, 1939, so that the defendant had no actual right to the use thereof after that time. West of the school land was the forest reserve, and the complaining witness and his associate had a grazing permit thereon and had had for 27 years. During the life time of Linch, who died about 1931, and since about 1911, the complaining witness and his associates had driven their cattle through the Linch lands above mentioned in order to reach the forest reserve, and no objection thereto was ever interposed. According to the testimony of the complaining witness no objection to do so was ever interposed by the defendant. This was denied by the defendant, who testified that he told Cameron in 1932 to "stay off" the land. The conflict in this respect was, of course, to be settled by the jury.

On June 5, 1939, the complaining witness endeavored to take 122 head of cattle to the forest reserve, entering the Linch lands a little after noon through a gate close to the eastern boundary of these lands. He was assisted by his nephew Crago. The cattle traveled a little to the southwest. When they had traveled approximately half of the distance of the $3/4$ mile above mentioned, the defendant attempted to stop them, and directed the complaining witness to drive them back. According to the testimony of the complaining witness, some of the cattle had been to the forest reserve previously, and were anxious to go in that direction; that it was difficult to drive them back; that they had already gone approximately half the distance across the Linch lands, and that he accordingly ignored the demands of the defendant, but kept driving the cattle onward to the west. Defendant thereupon, according to the complaining witness, stated that "you son of a bitch, I will see whether you go back or not," and proceeded to get his gun. The complaining witness, who was on horseback, rode away, so as to get out of the reach of the gun; the defendant followed him in his automobile, and while he was driving aimed the gun at him and fired. The complaining witness then said "Did that dirty son of a bitch shoot at me?" It is not certain whether the defendant heard that or not. The latter had but one shell, and he thereupon, as he himself admitted, stated that he would go to his house, about half a mile distant, and get more shells, which he did, finding, however, but one shell. In the meantime the complaining witness, afraid of the defendant, as the testimony shows, drove the cattle to the west line of the defendant's land as rapidly as possible. They were substantially off that land, or on the border of it, when the defendant, after obtaining an additional shell—all he could find—arrived at that place, accompanied by his wife. The state's evidence shows that

Cameron was riding a gentle horse about 13 years old, and stopped still when defendant arrived; that the latter got out of his automobile, ran toward Cameron about 20 feet, aimed his gun at Cameron, but shot Cameron's horse instead. The horse fell; Cameron jumped off. The defendant then rushed at him, holding the barrel of the gun in both hands, as though to strike Cameron over the head with all his might. The latter, however, threw up his right arm, warded off the blow, which instead of landing on the head, landed on the right arm of the complaining witness, severely injuring it. Cameron then grabbed the gun, holding it. The defendant thereupon used his fist, knocked the complaining witness unconscious, and seemingly, while the latter was down, kicked him, but ceased when his wife told him to stop. The complaining witness had a cut on his right forearm, four or five inches in length, extending through the soft tissues to the bone. The nasal bones were broken and bled freely; both cheeks and the whole front of the face were badly bruised, his hip was injured, and when, subsequently, on that day Dr. Clarenbaugh treated the complaining witness, the latter was still somewhat dazed. When Cameron regained consciousness, after the assault and battery as above mentioned, the defendant put him in his—the latter's—automobile, told him that he would take him off his place and for him to stay off, drove him back close to the gate above mentioned, where the complaining witness got out of the car. According to the testimony on behalf of the State, no provocation whatever for the assault here stated was given to the defendant, unless it be that, after the horse was shot down, the complaining witness stated "Why you bastard, you killed my horse." While it at first seemed that the horse was killed, it got up, after having fallen, and then ran off. Much is made as to the exact wound

which was inflicted upon the horse, but it does not appear to be important.

The testimony on behalf of the defendant was different. He admitted firing the gun at the first encounter, but claimed that he aimed it neither at the complaining witness, nor at the horse, but in the air. He admitted stating that he was going after more shells, but explained it by stating that he said that loud enough so Cameron would hear him and turn the cattle back. He admitted that when he came back from his house, after getting another shell for his gun, the cattle were substantially on the border between his land and the State land. He testified that he then told Cameron to turn his cattle back; that Cameron then "let a shrill scream," stating: "Go to the house, you dirty Dutch sons of bitches and stay there," rode his horse directly toward him, the defendant, to run over him, at the same time hitting him with his bull-whip; that he fired at the horse, so as not to be run over by it; that Cameron then said: "You dirty bastard, you killed my horse;" that he subsequently repeated the statement, came towards the defendant, hitting him with the bull whip; that then he, the defendant, in self defense took hold of the gun with his right hand— apparently aiming to strike Cameron—but hit it on the ground, and thus broke the gun; that he warded off the strokes of the bull-whip with his left hand, and after breaking the gun, hit the defendant with his fists.

There was thus a conflict in the testimony. It was for the jury to solve it. We are not in position to say that they did not solve it correctly. It cannot be said to be surprising that a man who carries a gun, fires it, gets more shells for it, again appears with it, is discredited in the eyes of a jury, when he testifies that he used it only in self-defense. Cameron weighed 142 pounds; the defendant 220 pounds. It may be that Cameron, angered by the shooting of his horse, or, as

is more likely, to stop the defendant who came toward him with a deadly weapon—the gun, the barrel of which was held by him in his two hands—struck the defendant with his whip. But it would seem difficult to make a jury believe that a little man, weighing 142 pounds, and who sees a man of 220 pounds with a shot gun in his hands, which he had already fired at the first encounter, would take the aggressive attitude testified to by the defendant and his wife. Moreover, Cameron did not know how many shells the defendant had. The ordinary man would, under the circumstances shown herein, be afraid for his life, and we may well believe that to have been true with Cameron, as is shown by the testimony for the state. As a matter of fact, we should not be surprised that the one fortunate circumstance in the case—fortunate both for the defendant and Cameron—was the fact that the defendant was able to find but one shell in his house.

It is argued that no malice was shown, since the defendant merely acted in self-defense and what he did was merely to protect the property in his possession from a trespasser. There is no merit in the argument. We have already stated sufficient on the question of self-defense. Cameron had no right, of course, to trespass on defendant's land. But that trespass can not be judged too harshly, if we take the testimony as correct that for 27 years previously the cattle had been driven through the same land without objection whatever. The defendant claimed that at the time of the first encounter, the cattle were not quite halfway across his land, and that he wanted them to be turned back at that time, because some of the land not yet crossed was valuable native-hay land. The testimony on the part of the state tended to show that there was little, if any, grass on any of the land at the time, since sheep had been grazing on it. In any event, the reason given above turned out to be mere pretense, since the de-

fendant, according to his own testimony, still wanted the cattle to be turned back when practically off his land, and so seemingly wanted them to destroy more grass on the trip back. It is apparent that at that time he did not want to protect his property from trespass. What he wanted then was revenge.

An owner or a person rightfully in possession of property has the right to repel or terminate an unlawful intrusion thereon. But he has no right to use any more force than is necessary. "Self-help has always been reckoned as a perilous remedy owing to the stringent rules against its abuse." Winfield, Textbook on Tort, p. 11. A trespass not involving the protection of a home does not justify the use of a deadly weapon or the infliction of great bodily harm. 6 C. J. S. 952-3; 5 C. J. 743-4; 4 Amer. Jur. 160-161; Restatement of the Law of Torts, sections 77-82. "The law does not penalize a mere trespasser whose presence is known by suspending the general duty which requires one to conduct his activities without subjecting others to unreasonable danger." Harper, Torts, p. 213. The owner, it has been said—a statement equally applicable to one rightfully in possession—should have reason to believe, in case of an intrusion, before inflicting bodily harm, that such intrusion can only be prevented or terminated by that means. Sec. 77, Restatement of the Law of Torts; 4 Am. Jur. 160. It could not in this case be prevented, since Cameron was on the land, nor was it necessary to terminate it by the means used, since it is clear that, when the violent assault shown by the State's testimony was made, Cameron and the cattle were just on the point of leaving the defendant's property.

After reading the record in this case, we are satisfied that there was ample evidence under which the jury were justified not only in finding that the defendant did not act in self-defense, but also that the assault

and battery upon the complaining witness was unlawful and malicious.

■ Error is assigned on account of misconduct of the special prosecutor herein. The defendant, when on the witness stand, was asked whether that was the first time he had struck anyone with the gun which the defendant had. An objection to the question was sustained. Defendant was then asked: "Didn't you strike Pete Harper with this same gun last March over the head?" An objection was made to this question. The court sustained the objection, and directed the jury to disregard the question. The special prosecutor then suggested that the admonition be also referred back to the previous question, and the court then stated: "The jury will be instructed to disregard the questions that were asked concerning any previous altercation of the defendant with any one else, or anything that was said in court regarding that." The questions tended to indicate that the defendant had been guilty of an unlawful assault upon someone else. It was, perhaps, error to ask them. State v. Sorrentino, 31 Wyo. 129, 144, 224 Pac. 420, 34 A. L. R. 1477; Kinney v. State, 36 Wyo. 466, 471, 256 Pac. 1040. If so, we feel satisfied, as may be gathered from what we have already stated, that the error in this case, if any, was not prejudicial, particularly after the admonition of the court above mentioned.

■ Error is assigned also in that the special prosecutor stated in his closing argument: "The defendant came into the saloon after the fight, and boisterously said: 'Now you cannot call me shot-gun Louis any more' and threw his broken shot gun along the floor." That the special prosecutor made such statement is claimed by an affidavit signed by Cecilia Schloredt, wife of defendant, filed in the case January 13, 1940. It was filed after the time when the record on appeal is permitted to be filed, and cannot, accordingly, be

considered. We might mention, however, that the statement, if made, is substantially in accord with the testimony in this case, except that it is colored by the term "boisterously." That coloring would not be sufficient to constitute a reversable error.

■ Defendant complains of a statement made by the county attorney in connection with the introduction in evidence of the shirt worn on June 5, 1939, by the prosecuting witness. No exception was taken to the statement, nor do we consider it prejudicial. It is also claimed that the verdict is contrary to the instructions of the court. We have read over the instructions, to which no exceptions were taken. We cannot see that the jury's verdict is contrary thereto.

We have carefully considered the record herein. We find no prejudicial error, and the judgment herein must be affirmed.

*Affirmed.*

RINER, Ch. J., and KIMBALL, J., concur.