THE STATE OF WYOMING,

*Plaintiff and Respondent,*

vs.

JOHN BERGER,

*Defendant and Appellant.*

(No. 2593; January 26th, 1954; 265 Pac. (2d) 1061).

424

For the defendant and appellant the cause was submitted upon the brief of H. F. Fellows of Rapid City, South Dakota; Lem Overpeck of Belle Fourche, South Dakota and R. G. Diefenderfer, of Sheridan, Wyoming, and oral argument by Mr. Diefenderfer.

For the plaintiff and respondent the cause was submitted upon the brief of Howard B. Black, Attorney General; Paul T. Liamos, Jr., Deputy Attorney General, James L. Hettinger and Robert A. McKay, Assistant Attorney General, all of Cheyenne, Wyoming, and oral argument by Mr. Howard B. Black.

## OPINION

RINER, Justice:

The defendant and appellant in this case is one John Berger who was the defendant and appellant in our case No. 2614, Glover vs. Berger, Wyo. 263 P. (2d) 498. It is conceded that this criminal prosecution arose on account of what transpired on September 13, 1951, in front of Berger's house in Crook County, Wyoming, near Oshoto. The facts in the case are quite fully set forth in the case filed in this court in the civil action,

Glover vs. Berger, aforesaid. It will not be necessary to detail the facts here too voluminously as they, as stated above, were set forth quite extensively in the civil case aforesaid. As a consequence of what occurred at the Berger ranch on the day mentioned there were filed in the district court of Crook County, Wyoming, three cases, viz: the civil action of Glover vs. Berger and two criminal proceedings, one of which was the case at bar, State vs. Berger, in which Henry Boles appears as the complaining witness and the other State vs. Berger in which Lee Glover appeared as the complaining witness. In the Glover criminal case Berger was charged with having committed an assault and battery on Lee Glover with intent to murder him. That case, with the civil case of Glover vs. Berger aforesaid, was transferred on change of venue to Campbell County, Wyoming, and both were subsequently tried at the town of Gillette, the County seat of that county. In the civil case the Campbell County jury returned a verdict in favor of Glover for $15,000 upon which judgment against Berger was rendered in that amount. The criminal case of State vs. Berger was also tried at Gillette, to a jury which found Berger guilty only of assault and battery on Glover, the man who was wounded in the arm, and the court imposed a sentence upon Berger on that verdict of $100 fine which was paid and no appeal was taken. The Glover criminal case was tried in the Campbell County district court before the civil case of Glover vs. Berger was considered by the court.

The other criminal case, based on substantially the same facts except that Boles, the complaining witness, was not injured in any way, as we shall see, was allowed to remain in the district court of Crook County and was tried there at its county seat in the town of Sundance, Wyoming. The charge being that of "assault

with intent to kill and murder Boles." This case is the one at bar and the verdict of the jury therein was "guilty of assault with intent to commit manslaughter as charged in the information." Upon this verdict Berger was sentenced to imprisonment in the State penitentiary for a term of from two to three years. From this sentence and judgment Berger prosecutes this appeal.

We shall endeavor to compress the facts appearing in the record into as brief a compass as possible, at the same time endeavoring to give as accurate a statement as can be made without omitting any really important element that should be given consideration.

In September, 1951, John Berger, the defendant herein, was engaged in operating a ranch property and some bentonite mineral interests in the vicinity of the Oshoto post office located on the western slope of the Black Hills in Crook County, approximately 20 miles north of the town of Moorcroft, Wyoming. Employed by Berger and living in his house were a young married couple, Darryl and Mae (May) Baker. The Berger ranch adjoined the ranch owned by Mrs. Mabel Fowler at one point and at another it touched the ranch operated by Lee Glover. Henry Boles was employed by Mrs. Fowler and lived in her ranch house. A few miles only separated the ranch houses of Berger, Mrs. Fowler and Glover.

Berger had lived on his ranch for about 50 years and was in the neighborhood of 65 years old at the time the events occurred, presently to be described. As many ranch folks in Wyoming frequently do he owned a rifle which he kept in his home. Glover was 31 years old and had lived on his ranch for many years. He was well acquainted with Berger and for the most part their intercourse was on a friendly basis, although on one oc-

casion during the winter of 1948 they had a dispute at an ice pond concerning some straying horses belonging to Glover. But while Glover had violently shaken Berger at that time, it seems to have engendered no permanent ill feeling between the two men for they visited with each other as neighbors on several occasions thereafter.

Henry Boles, who was about 48 years old at this time, had known Berger since 1946 when Boles started working at the Fowler ranch. It seems he and Berger were also friendly, never having any trouble of any kind between them as neighbors, riding in each other's pastures as adjoining ranchmen on friendly terms often do. Even on September 10, 1951, just three days before the trouble which ensued on September 13, they had agreed to do some fence work together on September 12th. At that time they went in Berger's truck and visited at some bentonite pits. On account of weather conditions Boles did not see Berger in order to work together as agreed. Instead, he and Mrs. Fowler went on an errand and procurred some groceries for the ranch and returned to the Fowler home early in the evening of September 12, 1951. Mae Baker was there waiting for them. She then told Mrs. Fowler and Boles that when she, with her husband, and Berger had returned to the Berger ranch earlier that evening after visiting with her parents, they found two strange bulls attacking a bull which was owned by Mrs. Baker and which she had left tied to a tree during their absence. The brands on the two strange bulls were not capable of being deciphered, consequently, Mrs. Baker had ridden over to the Fowler ranch to learn if the animals belonged there. If they did, Mrs. Baker wanted Boles to come over and get them right away that evening so that the corral in which the animals were confined could be used that evening for milking cows. It appeared that one of these bulls belonged to Mrs. Fowler and

the other was being pastured by her for another person who in fact owned the animal. Boles informed Mrs. Baker that he could not go over that night as he had, at that time, no saddle horse available. A rather unpleasant dispute developed between Mrs. Baker and Boles, and she shortly afterwards departed for her home in a somewhat angry frame of mind. Boles, however, told Mrs. Baker that he would go over the following morning and get the bulls. Darryl Baker upon learning what had occurred at the Fowler ranch endeavored to get the sheriff of Crook County to come and get the bulls, but was unable to locate that official. Meanwhile, Boles and Mrs. Fowler went to the Glover place and got Glover to agree to go with Boles the following morning to get the animals and also to determine what injuries, if any, Mrs. Baker's bull had suffered. On the morning of the 13th of September, 1951, these two men, Boles and Glover rode on horseback to the Berger house. On the way over they saw Mrs. Baker working with some of her own cattle. After talking briefly with her, Boles and Glover rode up towards the Berger house, accompanied by Mrs. Baker. Arriving there Mrs. Baker left the men and put her horse in the barn. However, the two men rode on to the house which was enclosed with a fence in front, the fence having a gate in it about 25' or 30' from the house. Darryl Baker was working on his truck a few feet away from where Berger and Glover stopped their horses.

In our case No. 2614 which was the civil action brought by Lee Glover against John Berger, the events which took place at the Berger ranch on September 13, 1951, and on which the case at bar was also based, were fairly well described and it will not be necessary to repeat them here.

However, at the risk of some repetition we desire to

give a brief abstract of the direct testimony in substance of Henry Boles, the complaining witness in the case at bar, as to what occurred, as he saw it, on September 13, 1951, at the ranch of John Berger:

About three quarters of a mile from the Berger ranch Boles met Mae Baker. She was driving cattle at the time and Boles rode over to where she was and asked her where the Fowler bulls were and where John Berger was. After talking with Mrs. Baker, Boles and Glover rode on to the Berger ranch to see about getting the Fowler bulls. Glover, Mrs. Baker and Boles galloped along side-by-side and eventually rode up to the ranch in single file, Mrs. Baker leading. Boles did not see John Berger as he was riding up to the house; he was about 50 or 60 feet from the Berger home before he saw Mr. Berger. He, Berger, at that time was standing on the porch and when Berger saw Boles and Glover, he turned and went into the house and came out with a gun and said with an oath: "Get your hands up in the air" and he kept swearing and coming right toward Berger and Glover. He then said: "You have come here looking for trouble haven't you?". Boles said: "No, John, I havent" and Boles further stated he said at that time: "I just came after the bulls," and then Berger said: "Shut up." Berger kept on saying: "Keep your hands up there." Finally, Berger looked at Glover and said: "I ought to shoot you." He also said he should have shot Glover the day Glover was riding in Berger's pasture looking for his, Glover's horses. Berger again said: "Keep those hands up there." Boles stated that both he and Glover had their hands in the air all the time. Berger finally took a shot at Glover; then said: "I will wing you" and he pulled down and missed Glover that time but with his next shot he hit Glover in the arm. Berger was talking to Mr. Glover at that time. Boles stated he had no further conversation with

Berger at that time, aside from saying, "No, John, I didn't." Boles stated that was all he got to say. Boles himself, was going to explain why he came there and his reasons as to why he went there. After Berger shot Glover he whirled around and took a shot at Boles. Boles said he knows Berger shot at him because it was close enough for him, Boles, to feel the breeze and concussion of the shot as it went by him. Berger carried his rifle all the time and was going to take a shot at Boles with it. That answer was objected to and request made of the court that it be stricken as not responsive and falling for an opinion and conclusion of the witness. The court, however, ruled that it should stand. After Berger had taken a shot at Glover, Boles stated Berger told Lee Glover to get on his horse again saying: "You get down that road." Mr. Glover started for home but Mrs. Baker and her husband, Darryl, said: "You had better let us put a tourniquet on the arm" and Mr. Cummings, a man who runs the road-grader and who had just come up to the ranch at that time, helped to put this tourniquet on Lee Glover's arm, Cummings saying: "You had better get that arm to a doctor."

Boles was probably at that time 25′ or 30′ from the front of the house; Berger was between 15′ and 20′ from Boles. Boles stated he was not armed at that time and neither was Glover; he further stated that he had no weapon of any kind in his hand, he did not see Mr. Glover with a weapon.

Boles was sitting on his horse and Berger started cussing him saying that he ought to kill Boles. Berger said also: "You get them bulls and you get them out of here." Boles stated he said: "All right, John," and kept his hands up in the air all the time. He was going to get off his horse and open up the gate into the corral but Berger said: "Get back there; I'm going to open

this gate." Boles was on horseback and Berger again said: "You keep your hands in the air." The reins of Boles' horse were held up in the air. Boles rode into the corral and kept his hands in the air all the time and took the bulls out and started to go on down with the bulls but Berger hollered out to him: "Hold up there." Boles started to turn around and Berger said: "Stay right where you are." Darryl Baker then led Lee Glover's horse over to Boles so that he could take it back with him and after Baker had turned over Glover's horse Boles went on home with the bulls.

Before going to the Berger ranch, Boles asked Mrs. Baker where the bulls were and she said: "up to the corral" but would not say where her bull was, but she did tell Boles where the Fowler bulls were, i.e. in the Berger corral.

The shooting took place in front of Berger's house, which house had a little fence around it and had a gate in the fence. From the door of Berger's house to the gate was between 10 and 15 feet.

Boles stated he was on friendly terms with Berger and was with him just three days before the time the shooting occurred. He was with Berger for quite a long time on the 10th of September and was up at Berger's house with him. He was also out in the fields with Berger. On this occasion three days before the shooting Berger made no threat to kill Boles and did not indicate that he was not friendly to Boles.

Boles stated that he and Glover, both friends of Berger's rode up to Berger's house in response to a request that was sent them through Mae Baker to come and get Mrs. Fowler's bulls. In other words, Mae Baker (an employee of Berger) went to see Mrs. Fowler and asked that Boles, who was employed by Mrs. Fowler, should

go up to the Berger ranch and get the Fowler bulls which were in his corral.

When Berger shot Lee Glover, Boles was practically side by side with Glover on horseback. Boles stated Berger made both Boles and Glover put up their hands before he talked to them.

Berger was 15′ to 25′ from Glover when he shot at the latter and hit him in the arm. Boles stated that if Berger was not shooting at him, Boles, he does not know what Berger's intentions were as he could feel the concussion of the bullet as it went past him. Boles further stated he did not know what occurred between him and Berger on the 13th of September, 1951, that caused Berger to shoot at him. As far as he knew nothing at all occurred. Out of a clear sky with no action on his part whatever his former good friend, Berger, shot at him. Boles claims that Berger shot at him with intent to murder but what Berger's reasons were he did not know. Berger and he had been good friends.

Boles said that after Berger shot Glover he held the gun on Boles and when Boles' hands were in the air, Berger told him to get those bulls. Berger followed Boles down to the corral gate and when Boles started to open it Berger told him to stay back and that he, Berger, would open the gate, and that Boles was to get the bulls out of there. So far as Boles knows the gun was held on him all the time he was getting the bulls out of the corral. Boles did not turn or look around to see when Berger took the gun off him. Boles still had his one hand in the air when he came back and got Glover's horse. Boles had not had an argument with Berger.

Boles stated that Berger did not attempt to shoot him after he, Boles, went into the corral. Boles then left Berger's place without any trouble or interference

at all. Boles finally got the bulls, the thing for which he had come to Berger's ranch.

The first thing Berger said when Glover and Boles came to the house was: "Get your hands up in the air." After the shooting, Berger told Boles repeatedly to go on and get the bulls. There was no difficulty or friction between Berger and Boles. On re-direct examination Boles testified that three shots were fired; two shots at Glover (the second one hitting him in the arm) and one at Boles.

We desire also to supply a brief review, largely in narrative form, of the testimony of Howard Cummings, the independent witness for the State who testified, to abstract it briefly, that he runs a road-grader belonging to the Wyodak Chemical Co. He was so employed on September 13, 1951, on the John Berger road. Cummings stated he saw Berger when he, Cummings, was about 100 yards from the Berger house. Berger had a 30-30 rifle with him. When Cummings first arrived at the Berger ranch and was fairly close to the house Berger was holding a gun on Henry Boles. Shortly after Cummings arrived there Berger warned Boles to go out in the corral and get the bulls. Berger was talking to Boles and telling the latter to get his hands up and keep them up. Berger said Glover and Boles had come up to the Berger house hunting for trouble and they found it. The gate that goes into the corral where the bulls were was about 75 or 100 feet from the house. As Boles rode up to the gate he started to get down from his horse, but Berger told him to: "Get on that horse, I will open open the gate." He swore a little. Henry Boles got on his horse and rode 20 feet or so away from the gate. John Berger opened the gate. Boles rode into the corral and Berger rode or walked in with him and kept swearing at Boles all the time. Boles took his horse and chased the bulls out of the corral. Then Boles started to

leave the ranch but when he had gone about 50 feet from the corral Darryl Baker brought Lee Glover's horse up to him for him to take home. Cummings saw no arms whatever in the hands of either Boles or Glover and they did not have their ropes down. They had no weapons that Cummings could see. Boles' hands in both going and coming from the corral were high up in the air. He had his bridle reins in his left hand. Cummings did not hear the shots as the road-grading machine makes too much noise. Cummings was there when Mrs. Baker was binding up Glover's arm. That was immediately after the shooting. From where Cummings was, on his machine, he could tell that the man with the rifle was Mr. Berger.

It appears from the testimony which was abstracted and set forth in our opinion, Lee R. Glover vs. John Berger, No. 2614, and which does not appear to be questioned in any way, that Cummings was there immediately after the shooting and stayed there about 20 minutes. It also appears that during that time Berger was holding his rifle—aimed at Boles—and that no shots were fired during the time that Cummings was on the Berger ranch. It is also undisputed that Cummings helped the Bakers bandage Glover's arm after the shot and helped in the application of a tourniquet to that arm.

With the foregoing statement of facts and the abstracts of the Boles' and Cummings' testimony before us we proceed to examine the sufficiency of the evidence to sustain the charge made against the defendant which was in substance that he wilfully and unlawfully attempted to commit a "violent injury upon the person of one Henry Boles * * * having then and there the present ability to commit said injury, by then and there unlawfully with premeditated malice shooting at the said Henry Boles with a certain rifle," which the de-

fendant Berger held, "with intent * * * the said Henry Boles unlawfully" * * * "and with premeditated malice * * * him, the said Henry Boles, to kill and murder."

Recurring to the facts in this case as above stated and the testimony of the main witnesses for the State, Boles and Cummings, we are unable to see that the State proved that there was any intent with premeditated malice or any malice at all on the part of the defendant, Berger, to kill and murder Henry Boles. The proof was that the shot fired at Boles was by a man skilled in the use of a rifle, and that the first and only shot thus taken missed Boles and that although thereafter the defendant held his gun "on" Boles for a matter of some 20 minutes at close range no other shot was fired at Boles as had been directed at Glover, who had been struck in the arm only by Berger's second shot. It will be recalled that the defendant was only 10′ or 15′ from both Glover and Boles when he fired the three shots. The men at whom these shots were directed were, at the time, both on horseback and a skilled rifleman standing on the ground if he really intended to inflict upon them serious injury could have had no difficulty whatever in doing so. Instead Berger's second shot at Glover struck the latter in the arm only, and the third shot missed Boles entirely, not even a second shot was fired at Boles. Berger who had every opportunity to kill and murder both Glover and Boles saw fit to hit Glover only in the arm or as Berger said at the time, to "wing" him. The Campbell County jury, as we have seen, deemed it just and proper to find Berger guilty only of assault and battery so far as Glover was concerned. That result received the approval of the trial court by its judgment from which no appeal was taken.

We next proceed to examine certain rulings of the trial court in the reception of evidence in the cause:

Counsel for the State propounded to Boles on the latter's direct examination: "Q. 103. Was he carrying this rifle all this time? A. Yes he was. Q. 104. What was his demeanor with that rifle? MR. FELLOWS: That is objected to as calling for a conclusion of the witness. THE COURT: Objection sustained. (Exception allowed.) MR. MORGAN: Q. 105. What was he doing at that time? A. He was going to take a shot at me with it. MR. OVERPECK: Objected to, if the Court please, and ask that it be stricken as not responsive, and it calls for an opinion and conclusion of the witness. THE COURT: Overruled. It may stand." It is apparent that the court ruled correctly as to the question No. 104 propounded to the witness. Nevertheless counsel for the State pursued the matter further with Q. 105. We think it obvious that the court's ruling on the answer to Q. 105 was quite different and the answer of the witness was allowed to stand although it was not responsive to the question asked. Then, too, the witness was permitted to inject before the jury his own conclusion and opinion as to "what Berger was going to do" in the future with the rifle.

Vol. 2. Wharton's Criminal Evidence (Eleventh Ed.) § 944, pp. 1658, 9 states that:

"As a general rule, the testimony of a witness must be limited to the facts of which he has personal knowledge. Giving in evidence his opinion or conclusion upon matters within the scope of common knowledge and experience, or where all the relevant facts can be introduced, is not permitted. It is the peculiar province of the jury to draw deductions and form conclusions from the facts shown by the evidence, and questions which call for the ultimate conclusion of a witness on the facts invade that province. Furthermore, the danger that the members of the jury may substitute the opinion for their own is involved."

In Wadkins vs. Commonwealth, 228 Ky. 106, 14 S.W. (2d) 390, 391, the court said:

"Ordinarily, a witness should state facts within his personal knowledge, and not be permitted to give his opinion or conclusion upon matters within the scope of common knowledge and experience, where all the relevant facts can be introduced in evidence, and the jury are competent to draw a reasonable inference therefrom. American Acc. Co. v. Fidler's Adm'x, 35 S.W. 905, 36 S.W. 528, 18 Ky. Law Rep. 161; Louisville & N. R. Co. v. Conn. 179 Ky. 478, 200 S.W. 952, Security Mutual Life Ins. Co. v. Little, 157 Ky. 276, 162 S.W. 1131. The danger involved in receiving the opinion of the witnesses is that the members of the jury may substitute such opinion for their own. Hames v. Brownlee, 63 Ala. 277; Coons v. Pritchard, 69 Fla. 362, 68 So. 225, L.R.A. 1915F, 558."

Other rulings of similar purport were made by the court which allowed volunteer statements of witnesses to stand in the record when a fair trial of defendant would seem to require that they should have been excluded. We deem it unnecessary to review them all.

Next, we find it appropriate to refer to some instructions which the court gave to the jury. Instruction No. 1. given the jury reads: "You are instructed that the information in this case charges an unlawful and felonious attempt to commit a violent injury upon the person of Henry Boles by the defendant, who then and there had the present ability to commit said injury."

In juxtaposition with that Instruction should be read the first two sentences of Instruction No. 7, as follows: "In order to convict John Berger in the manner and form charged in the information, it is necessary for the State to satisfy you beyond a reasonable doubt, that it was committed with an intent to murder Henry Boles, and if Henry Boles had died as the result of the shot fired at him, John Berger would have been guilty of murder, either of the first or second degree. The intent to commit murder is an essential element of the charge and it must be proved to your satisfaction; just as any

other material fact in the case." It is quite obvious that these instructions are contrary and misleading. In Instruction No. 1. there is not the slightest mention of intention on the part of Berger to kill Boles. As above indicated there was abundant opportunity on the part of Berger to murder Boles if he had actually intended to commit that crime.

Where a charge of the court to the jury has contradictory elements in it this puts upon the jury the burden of determining which Instructions they should follow. As said in State vs. Vliet, 120 N.J.L. 23, 197 A. 894, 895:

"Where the law is thus incorrectly charged, although it has been correctly stated elsewhere in the court's charge, it puts the burden upon the jury to determine which part of a contradictory charge is correct, and this is not, and cannot be, a jury's duty under any circumstances."

In Instruction No. 9. the jury was told: "And, if you believe from the evidence in this case that the Defendant used more force in the protection of *his property* than the circumstances warranted, you will find the Defendant guilty of some degree of the offense charged." This part of the Instruction was contrary to the evidence in the case. The bull which was injured was owned by Mae Baker, an employee of Berger, and the injuries to that animal, if any there were, were inflicted before the altercation between Berger, Glover and Boles took place. Assuming that Berger was trying to force the two horsemen, Glover and Boles, to leave his premises as being trespassers the evidence is undisputed that Mrs. Baker, evidently acting for Berger, invited these two men over to the Berger place to get the animals and take them away and that was exactly what was done as we have indicated. There was no trespassing on Berger's property. The Instruction

was not clear but on the contrary it was confusing and did not inform the jury how they should construe the charge or what meaning they should ascribe to it in this particular.

Instruction No. 10 in its first paragraph told the jury that: "You are instructed that the information in this case charges the defendant with an assault upon one Henry Boles with intent to commit murder in the first degree; and it, therefore, embraces, from the fact of charging an assault with such intent, all degrees embraced in that crime; which are, an assault with intent to commit murder in the first degree, an assault with intent to commit murder in the second degree, an assault with intent to commit voluntary manslaughter; an *aggravated assault*, and a simple assault." It will be observed that there is no such crime in this State as "aggravated assault." The court made no attempt to define it, and, indeed, could not do so, although the definition of all the other alleged crimes involved in the information was given the jury. The latter was then left to speculate what was meant by the instruction as an entirety.

Instruction No. 17 as given to the jury reads: "You are instructed that whoever unlawfully and maliciously inflicts upon another person, either with or without any weapon or instrument, any grievous bodily harm, or who unlawfully or maliciously cuts, stabs or wounds any other person is guilty of *aggravated assault* and battery." This, of course, is the correct definition of our statutory crime where the word "aggravated" is employed. The jury was obliged to determine for itself which was correct, Instruction No. 10 or Instruction No. 17, a duty which should never have been imposed upon it.

Without pursuing this review of the record further

we are inclined to agree with counsel for appellant that "at the most the evidence of the State only shows a simple assault." It does not support the finding of the jury that Berger was guilty of "assault with intent to commit manslaughter."

Inasmuch however as the finding of the jury includes an inferior degree of crime, that of assault, we shall adopt the course pursued by this court in State vs. Sorrentino, 31 Wyo. 129, 224 P. 420.

In view of the state of the record with the many errors therein appearing as above examined and commented on we think justice demands that we make a conditional order in this case, only. The State may elect by writing filed in this court within 30 (thirty) days to take a new trial in which event the judgment will be reversed and the cause remanded for that procedure. Unless that is done the judgment will be reversed as to "the intent to commit manslaughter" and affirmed for "assault" only. In that event the case will be remanded to the district court of Crook County with direction to cause the defendant, Berger, to be brought before it to be resentenced for that crime, taking into consideration the penalty imposed in the other criminal case against Berger and to make all necessary orders not inconsistent herewith.

BLUME, C.J., and HARNSBERGER, J., concur.