Michael L. McDERMOTT,
Appellant (Defendant),

v.

The STATE of Wyoming,
Appellee (Plaintiff).

No. 94–129.

Supreme Court of Wyoming.

June 7, 1995.

Rehearing Denied June 30, 1995.

Leonard D. Munker, State Public Defender, Deborah Cornia, Appellate Counsel, and Peter Froelicher, Asst. Public Defender, for appellant.

Joseph B. Meyer, Atty. Gen., Sylvia Lee Hackl, Deputy Atty. Gen., D. Michael Pauling, and Mary Beth Wolff, Sr. Asst. Attys. Gen., for appellee.

Before GOLDEN, C.J., and THOMAS, MACY, TAYLOR and LEHMAN, JJ.

MACY, Justice.

Appellant Michael McDermott appeals from his convictions for one count of aggravated assault, one count of kidnapping, and one count of first-degree sexual assault.

We affirm.

## Issues

Appellant presents three issues:

I. Did the trial court err in admitting testimony concerning [Appellant's] prior sexual assault conviction?

II. Was [Appellant] denied his right to a speedy trial?

III. Was [Appellant] denied his constitutionally guaranteed right to due process because of preindictment delay and unnecessarily suggestive identification procedures?

## Facts

During the summer of 1991, the victim in this case was working as a maid at the Plains Hotel in Cheyenne. She had been working alone in the early morning hours of July 7, 1991, in the laundry room which was located in the basement of the hotel. At about 4:30 a.m., while she was taking a break in the break room, sitting with her head down on her hands, the victim felt something hit the back of her head. When she turned around, she saw a man who was pointing a gun at her. The man told her not to scream, led her into the alley located behind the hotel, and apologized for making her head bleed.

The man took the victim to a nearby railroad underpass and told her to remove her clothing. The man removed his clothing and had vaginal intercourse with the victim. After he was through having intercourse with her, the man allowed the victim to dress, and they both smoked cigarettes. The man told the victim to wait for a few minutes. The victim obeyed, and the man disappeared. When the man returned a few minutes later, the victim became frightened that the man was going to kill her. In order to alleviate the victim's concern, the man gave the cylinder out of his gun to her. The man and the victim began walking down the street. While they were walking, the man showed the victim some rags and ties and said that he would have tied her with them if she had resisted. He also apologized to the victim, and he told her that, if she would give a false description of him to the police, he would take her to dinner. The man and the victim went separate ways, with the victim returning to the hotel where she asked the clerk to telephone the police. The victim described the man and the clothing he was wearing to the police.

Approximately eight months later, Cheyenne police officers arrested Appellant for being the perpetrator of a sexual assault which had occurred on March 20, 1992, and which involved another victim.[1] The officers discovered that the details of the 1992 sexual assault were similar to those of the sexual assault on the victim in this case. They

---

1. Our opinion in *McDermott v. State*, 870 P.2d 339 (Wyo.1994), contains a discussion of the March 20, 1992, sexual assault. 870 P.2d at 341–42.

asked the victim in this case to see if she could identify the man who had assaulted her from a photograph lineup. The victim identified Appellant as being her assailant. On April 6, 1992, the prosecution filed an information which charged Appellant with aggravated assault, kidnapping, and first-degree sexual assault with regard to the sexual assault in this case. Appellant's preliminary hearing was delayed until May 12, 1992, in order to permit a psychological evaluation to be completed. After the preliminary hearing had been held, the prosecutor moved to dismiss the information, stating that the State needed additional time in which to complete DNA testing. On May 27, 1992, the trial court dismissed the information without prejudice. The defense moved to rescind the order, and the trial court established a briefing schedule for dealing with the motion to rescind. Although both parties filed memoranda, the trial court did not rule on the motion to rescind its order.

On May 6, 1993, the prosecution filed a new information, charging Appellant with the same three counts as were charged in the original information. A jury found Appellant guilty on all three counts. Appellant brought this appeal.

### Evidence of Another Crime to Prove Identity

Appellant contends that the trial court abused its discretion when it admitted the evidence of Appellant's conviction for the 1992 sexual assault.

■ This Court affords great deference to a trial court's determination as to whether other bad acts evidence is admissible. As long as a legitimate basis exists for the trial court's ruling, we will not find an abuse of discretion. *Dean v. State*, 865 P.2d 601, 606 (Wyo.1993).

#### A. Identity Evidence

■ Appellant argues that the trial court abused its discretion when it determined that the evidence of Appellant's prior conviction for sexual assault was probative on the issue of identity. We disagree.

For evidence of other crimes to be admissible to prove identity, the inference of identity flowing from it must be extremely strong. To prove identity from *modus operandi*, the crimes must "bear such peculiar, unique, or bizarre similarities as to mark them as the handiwork of the same individual." *[United States v.] Myers*, 550 F.2d [1036,] 1045 [ (5th Cir.1977) ].

*Dean*, 865 P.2d at 607 (citation omitted).

Although the 1992 sexual assault and the sexual assault in this case were not identical, their common features created a powerful inference that Appellant had committed both assaults:

√ The victims of both assaults were abducted during the early morning hours at or near the Plains Hotel in Cheyenne;

√ Both victims were sexually assaulted at a remote location;

√ Both victims described the assailant's gun as being small with a removable cylinder;

√ The assailant tied the victim in the 1992 assault, and he told the victim in this case that he would have tied her if she had resisted;

√ The assailant smoked cigarettes with both victims after he had assaulted them;

√ The assailant told both victims that he was from out of town;

√ The assailant escorted both victims back to the area where they had been abducted, apologized to them, and asked them to give false descriptions of him to the police;

√ The victims gave similar descriptions of the assailant which included his round tattoo, body odor, and physical appearance; and

√ Both victims remembered that the assailant had distinctive eyes.

Considering the overwhelming similarities between the two assaults, we conclude that the trial court did not abuse its discretion when it found that the 1992 sexual assault evidence was probative on the issue of Appellant's identity.

## B. Probative Value Versus Prejudice

Appellant also argues that the evidence of his 1992 sexual assault conviction was highly prejudicial and that the prejudice outweighed any probative value which the evidence may have had with regard to identity.

When the trial court finds that the evidence of other bad acts is relevant, it must determine whether the probative value of the evidence outweighs several countervailing factors. *Dean,* 865 P.2d at 606, 609; *see also* W.R.E. 403.

In balancing against its probative value the unfair prejudice created by the evidence, the trial court should consider the extent to which the evidence distracts the jury from the central question whether the defendant committed the charged crime. The trial court should weigh these additional factors against the probative value of the evidence:

1. The reprehensible nature of the prior bad act. The more reprehensible the act, the more likely the jury will be tempted to punish the defendant for the prior act.

2. The sympathetic character of the alleged victim of the prior bad act. Again, the jury will be tempted to punish the defendant for the prior act if the victim was especially vulnerable.

3. The similarity between the charged crime and the prior bad act. The more similar the acts, the greater is the likelihood that the jury will draw the improper inference that if the defendant did it once, he probably did it again.

4. The comparative enormity of the charged crime and the prior bad act. When the prior act is a more serious offense than the charged crime, the introduction of that act will tend to place the defendant in a different and unfavorable light.

5. The comparative relevance of the prior bad act to the proper and forbidden inferences. Evidence of the prior bad act may be much more probative of bad character than it is of any legitimate inference permitted by Rule 404(b).

6. Whether the prior act resulted in a conviction. The jury may be tempted to punish the defendant if they believe he escaped punishment for the prior bad act. *Dean,* 865 P.2d at 609–10 n. 2 (citation omitted).

Appellant specifically contends that: (1) the trial court's conclusion that the second factor weighed less heavily in his favor than the first factor did was unreasonable and illogical; (2) the trial court misunderstood and misapplied the third factor; (3) the trial court incorrectly found that the evidence which pertained to the fourth factor was "in neutral"; and (4) the trial court did not understand the purpose of the fifth factor. Appellant argues that, if the trial court had properly applied the test for unfair prejudice according to *Dean,* the evidence of his conviction for the 1992 sexual assault would have been inadmissible.

In this case, the trial court carefully articulated on the record how it weighed the probative value of the evidence against the countervailing factors:

[L]et me say for the record that element No. 1 that is here on the Dean case, the reprehensible nature of the prior bad act, I think this certainly balances in favor of excluding the evidence. No. 2, the sympathetic character of the alleged victim of the prior bad act. That also balances in favor of excluding the evidence, but not nearly to the same magnitude that it does with respect to No. 1.

The similarity between the charged crime and the prior bad act, I think this element, in my opinion, goes in favor of the state. Namely, even though the evidence is being tailored somewhat, it's being tailored in order to avoid undue prejudice. I do agree with the state's view that this concept of 404(b) as applied to the issue of an identified tie is—to use a worn-out cliché—it's like a mark of Zorro theory. There are certain distinguishing features that individuals leave at crime scenes. That's really all the state is trying to show.

So, therefore, it's the similarity with respect to these distinctive features, not necessarily similarity with respect to the totality of the circumstances, which is the key.

No. 4, the comparative enormity of the crime charged in the prior bad act. Well, this is in neutral as far as I'm concerned because, again, the state is not going to bring out the reprehensible—the most reprehensible elements of the prior bad act. It's going to limit itself to those salient features; i.e., the mark of Zorro features, if you will.

No. 5, there is a serious question of identity here and I think the fact that the state's trying to use a prior bad act and tailoring it as best it can to avoid prejudice certainly militates in favor of admissibility. No. 6, the prior bad act resulting in a conviction. The jury would be tempted to punish the defendant if he escaped punishment. There certainly is no evidence that the defendant escaped punishment in the other case. In fact, probably, although I don't know that in the other case, it depends on if [Appellant] takes the stand it might come out. If he doesn't take the stand, it's clear that he was convicted of that prior crime and nobody knows what the sentence was.

It seems to me that on balance the Court is going to go ahead and allow this testimony under Rule 494(b). . . .

The trial court did not abuse its discretion. First, although *Dean* does not indicate that any one of the factors may be given more weight than the others are given, on the facts of this case the first factor was more important than the second factor was. Under the first factor, the 1992 assault was more reprehensible than the assault in this case was, while under the second factor, the two victims were of comparable vulnerability. Second, we agree with the trial court that the factor which related to the similarity of the offenses favored the prosecution because the prosecution planned to tailor its questioning to avoid recounting the details of the 1992 assault. Also, the trial court instructed the jury that it could consider the evidence of the 1992 sexual assault for only the limited purpose of identifying Appellant. Third, we agree that the comparative enormity of the offenses was of a neutral significance because the prosecution did not plan to elicit the most reprehensible details of the 1992 assault.

Fourth, the trial court correctly concluded that the fifth factor favored the prosecution. Appellant contested the prosecution's evidence of identity during the trial, and the prosecution's carefully tailored evidence of the 1992 assault was more probative on the issue of identity than it was on the issue of Appellant's bad character.

Since we have concluded that the trial court did not abuse its discretion when it admitted the evidence of Appellant's conviction for the 1992 sexual assault, we do not need to consider Appellant's contention that he was prejudiced by the admission of the evidence. *See Dean,* 865 P.2d at 608.

### *Speedy Trial*

Appellant alleges that he was denied his constitutional speedy trial right. He presents an extensive analysis of the four factors which we utilized to consider claimed violations of the speedy trial right when Rule 204 of the Uniform Rules for the District Courts of the State of Wyoming was in effect. *See Springfield v. State,* 860 P.2d 435, 450–51 (Wyo.1993); *Phillips v. State,* 774 P.2d 118, 121 (Wyo.1989); *Harvey v. State,* 774 P.2d 87, 92 (Wyo.1989). When the United States Supreme Court adopted this analysis in *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), it stated:

> We do not establish procedural rules for the States, except when mandated by the Constitution. We find no constitutional basis for holding that the speedy trial right can be quantified into a specified number of days or months. ***The States, of course, are free to prescribe a reasonable period consistent with constitutional standards,*** but our approach must be less precise.

407 U.S. at 523, 92 S.Ct. at 2188 (emphasis added). Consistent with the suggestion in *Barker,* this Court adopted W.R.Cr.P. 48.

■ Although W.R.Cr.P. 48 is somewhat similar to Rule 204, two crucial differences exist. First, this Court did not adopt Rule 204. The rule was not exclusive or mandatory; it was merely advisory in nature. *See Phillips,* 774 P.2d at 121; *Caton v. State,* 709 P.2d 1260, 1264–65 (Wyo.1985). This Court, on the other hand, did adopt W.R.Cr.P. 48 by an order, and this rule is mandatory. Sec-

ond, Rule 204 did not contain any sanction of dismissal. W.R.Cr.P. 48(b)(6), however, states: "Any criminal case not tried or continued as provided in this rule shall be dismissed 120 days after arraignment." This rule provides the exclusive framework for our speedy trial analysis. In accordance with W.R.Cr.P. 48, we calculate the length of a delay by excluding the time periods specified in W.R.Cr.P. 48(b)(3). After those time periods have been excluded, delays of fewer than 120 days are permissible, and delays of 120 days or more require that the case be dismissed.

■ Our analysis is simple in this case. Pursuant to W.R.Cr.P. 48, the responsibility to try Appellant in a timely fashion did not attach until Appellant had been arraigned. W.R.Cr.P. 48(b)(2). Appellant was arraigned on September 16, 1993. He stipulated and agreed to a trial date of February 28, 1994, and waived his speedy trial right for the period between December 6, 1993, which was the original trial date, and February 28, 1994. The time between the original trial date and the actual trial date is excluded from our analysis. W.R.Cr.P. 48(b)(3)(C), (b)(4). Thus, pursuant to W.R.Cr.P. 48, Appellant's trial was delayed only 81 days,[2] and his speedy trial right was not violated.

### Due Process of Law

Appellant claims that he was denied his constitutionally guaranteed due process right because of a preindictment delay and unnecessarily suggestive identification procedures.

### A. Charging Delay

■ Appellant asserts that, if the trial court's order which dismissed the charges tolled the speedy trial clock, the State should answer for an excessive preindictment delay.

Wyoming has no statute of limitations for criminal offenses, and prosecution for such offenses may be commenced at any time during the life of the offender. However, when a delay in bringing charges results in prejudice to a defendant, due

process considerations may arise. In order to require dismissal of a charge, it is necessary that a preindictment delay cause "substantial prejudice to [appellant's] rights to a fair trial and that the delay was an intentional device to gain tactical advantage over the accused." *Story [v. State],* 721 P.2d [1020,] 1027 [ (Wyo.1986) ], *quoting from United States v. Marion,* 404 U.S. 307, 324, 92 S.Ct. 455, 465, 30 L.Ed.2d 468 (1971). Substantial prejudice requires the showing of the loss of a witness, exhibit or other evidence, the presence of which would probably bring a different result. *Phillips v. State,* 835 P.2d 1062, 1069 (Wyo. 1992) (some citations omitted). The burden of proof to make the required showing is on the defendant. *See United States v. Engstrom,* 965 F.2d 836, 838–39 (10th Cir.1992).

■ Appellant concedes that seeking DNA testing is investigatory and, therefore, a proper reason for a preindictment delay, but he contends that the prosecution had other motives when it allowed eleven months to elapse before it refiled the exact same charges. He argues that his ability to defend himself was prejudiced by the delay because, after the eleven-month delay, an exculpatory witness could not be located and because the victim could not remember vital details about the procedure used by the police in showing her a photograph lineup. Appellant does not indicate what the testimony of the exculpatory witness would have been; therefore, Appellant has failed to show that he was prejudiced by the loss of this witness. The victim's inability to remember facts surrounding her pretrial identification of Appellant also did not constitute prejudice. The prosecution presented other evidence which was related to Appellant's identity, including both DNA evidence and the evidence of the similar features of the 1992 sexual assault. Appellant has also failed to prove that the prosecution sought the delay as an intentional device to gain a tactical advantage. *See, e.g., United States v. Muniz,* 1 F.3d 1018, 1024 (10th Cir.), *cert. denied,* —— U.S. ——,

**2.** We would reach approximately the same result even if Appellant had been arraigned before the trial court dismissed the information since W.R.Cr.P. 48 excludes both the proceedings on

another charge and the time between the dismissal and the refiling of the same charge. W.R.Cr.P. 48(b)(3)(B), (D).

114 S.Ct. 575, 126 L.Ed.2d 474 (1993). Because Appellant has failed to demonstrate that either substantial prejudice or an intentional delay occurred, the charging delay did not violate his due process right.

## B. Identification Procedures

■ Appellant claims that the procedures used to identify him were unnecessarily suggestive for numerous reasons: (1) the officers used a photographic array instead of an in-person lineup, (2) the first array was a poor quality photocopy, (3) the officers told the victim that they had a suspect in the case before they showed her the array, and (4) after the victim chose Appellant's photograph, she asked if she had chosen the right one.

> This court follows the United States Supreme Court's two-pronged approach when determining whether witness identifications violate due process. First, we determine whether the identification procedures were unnecessarily suggestive, *i.e.,* was the procedure surrounding the identification suggestive and if so were there good reasons why less suggestive procedures were not used. Second, if we determine that the identification procedures were unnecessarily suggestive, we look to the totality of the circumstances to discern whether the unnecessarily suggestive identification was otherwise reliable.... If we conclude that the identification was unnecessarily suggestive and not sufficiently reliable, then admission of the identification is violative of due process.

*McCone v. State,* 866 P.2d 740, 747–48 (Wyo. 1993) (citations omitted). When the pretrial identification procedures were not unnecessarily suggestive, we do not need to make any further inquiry. *Taul v. State,* 862 P.2d 649, 653 (Wyo.1993).

Approximately eight months after the victim had been sexually assaulted, the investigating officers presented two photographic arrays to her. The first array was a photocopy of six photographs. The victim told the officers that the pictures were too distorted for her to make an identification. Approximately two days later, the officers presented a second array for the victim to see which contained eight color photographs. They also told the victim that they had a suspect. The victim immediately selected Appellant's photograph, noted his distinctive eyes, and asked if she had chosen the right subject. The victim also identified Appellant in court.

■ We conclude that the procedures which surrounded the photograph lineup were not unnecessarily suggestive. Appellant does not explain how the use of the photographic array instead of an in-person lineup was suggestive in this case. We do not detect anything inherently suggestive about the use of a photographic array instead of an in-person lineup. Although the first array was a poor quality photocopy, all six subjects were represented by equally poor photographs. Both arrays were sufficiently large: the first array contained six subjects, and the second array contained eight subjects. All the subjects in both arrays possessed physical characteristics which were similar to those contained in the victim's description of her assailant, and all of them were shown from the neck up. *See Taul,* 862 P.2d at 653. The officers were not being suggestive by telling the victim before she made the pretrial identification that they had located a suspect. Appellant does not claim that the officers suggested to the victim who their suspect was. While the victim asked the officers if she had identified the correct suspect, the question is pertinent to the weight of her identification testimony and not to admissibility. *Taul,* 862 P.2d at 654.

### Conclusion

We have found no reversible error in any of the issues which were raised by Appellant; therefore, his convictions are

Affirmed.