**Leland Geoffrey YUNG, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

No. 94–39.

Supreme Court of Wyoming.

Nov. 7, 1995.

Rehearing Denied Dec. 5, 1995.

Leonard D. Munker, State Public Defender; and Deborah Cornia, Appellate Counsel, for Appellant.

Joseph B. Meyer, Attorney General; Sylvia L. Hackl, Deputy Attorney General; and Barbara L. Boyer, Senior Assistant Attorney General, for Appellee.

Before GOLDEN, C.J., and THOMAS, MACY, TAYLOR and LEHMAN, JJ.

TAYLOR, Justice.

Appellant contests his second-degree murder conviction. He raises a speedy trial issue; challenges the admissibility of his confession; the treatment of his affirmative defense; the sufficiency of the evidence; the jury's review of an exhibit; and the district court's refusal to admit expert testimony.

We affirm.

## I. ISSUES

Appellant presents the following issues:

ISSUE I

Did the trial court err when it failed to dismiss for lack of speedy trial?

ISSUE II

Did the court below err when it failed to suppress inculpatory statements which were obtained in violation of Appellant's constitutional rights?

ISSUE III

Did the trial court err when it improperly instructed the jury on the law applicable to this case?

ISSUE IV

Did the trial court commit reversible error by upon request, providing jurors with unlimited review of testimony without notifying defense of the request or response?

ISSUE V

Was there sufficient evidence to support a conviction of second degree murder?

ISSUE VI

Did the trial court den[y] Appellant his right to a fair trial when it ruled that it was inadmissible vouching for the credibility of a witness if experts testified that the Appellant fit the profile of a rape victim?

The State presents the following issues:

I. Did the State provide Appellant with a speedy trial?

II. Was Appellant properly mirandized and did he voluntarily confess to murdering Stephen Bennett?

III. Was the jury properly instructed on the law of the case?

IV. Did the district court err when it provided the jury access to a tape recorder so it could review an exhibit during deliberations?

V. Was the evidence produced at trial sufficient to prove beyond a reasonable doubt that Appellant was guilty of second degree murder?

VI. Did the trial court properly refuse testimony that either vouched for the credibility of Appellant or invaded the province of the jury?

## II. FACTS

On July 20, 1992, appellant, Leland Yung (Yung), was hitchhiking from Montana to Louisiana. Stephen Bennett (Bennett), returning to his home in Casper, Wyoming, picked Yung up in Montana at approximately 4:00 p.m. The two stayed the night in a motel in Gillette, Wyoming. Yung claims that Bennett sexually assaulted him that night at gunpoint.

The next day, Yung and Bennett met several of Bennett's friends for drinks at two different bars and a private residence. The two eventually left Gillette and started for Casper with Bennett driving. Bennett was very intoxicated and Yung asked to drive. The two switched sides and Bennett placed his pistol on the dash of the car.

On the way to Casper, the two turned off onto a secondary road. At that point, according to Yung, Bennett reached over and placed his hand on Yung's crotch. A struggle ensued and Yung gained control of Bennett's pistol. Yung ordered Bennett out of the car. When Bennett walked to the rear of the car, Yung shot him in the back of the head. After shooting Bennett, Yung

dragged the body off the side of the road behind a bush. Yung then left the scene.

On July 23, 1992, Yung was stopped for speeding in Little Rock, Arkansas. When asked for identification, Yung produced a wallet which contained Bennett's credit cards and social security card. He then told the officer that his name was Darrell Huffer. No records were found when Darrell Huffer's name was entered in the police computer. When informed of this, Yung stated that his name was Leland Yung and said he was seventeen years old.

The officer arrested Yung at approximately 10:35 a.m. for criminal impersonation. Yung was read his *Miranda* rights and indicated that he understood those rights. Yung was then taken to police headquarters in Little Rock and placed in an interview room. Near the end of a fifty-three minute interview which began at approximately 3:00 p.m., Yung confessed to killing Bennett. He said, "Okay, okay, I killed him. I shot him. I left him at the side of the road."

Yung was returned to Wyoming where he was charged with first-degree murder. A jury convicted him of the lesser included offense of second-degree murder. Yung appeals his conviction of second-degree murder.

## III. DISCUSSION

### A. SPEEDY TRIAL

■ Yung argues he did not receive a speedy trial. The right to a speedy trial is grounded in the constitutions of the United States and the State of Wyoming. However, constitutional analysis must be delayed until we have addressed the application of W.R.Cr.P. 48. This rule is a procedural mechanism by which a criminal defendant may enforce his constitutional right to a speedy trial. We have held that this rule is mandatory. *McDermott v. State*, 897 P.2d 1295, 1299 (Wyo.1995). The mandatory nature of W.R.Cr.P. 48 demands that counsel and the district courts be attentive to the requirements of the rule. It is the responsibility of the district court, counsel and the defendant to see that these requirements are fulfilled. W.R.Cr.P. 48(b)(1). It is the responsibility of this court when reviewing a

conviction to ensure that the mandates of this rule and the constitutional guarantee of a speedy trial have been met.

■ Constitutional analysis of a speedy trial claim requires that we consider the four factors articulated in *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101 (1972), and adopted by this court in *Cosco v. State*, 503 P.2d 1403, 1405 (Wyo. 1972), *cert. denied*, 411 U.S. 971, 93 S.Ct. 2164, 36 L.Ed.2d 693 (1973). This test requires us to consider: (1) the length of delay; (2) the reason for the delay; (3) the defendant's assertion of his right; and (4) the prejudice to the defendant. *Roderick v. State*, 858 P.2d 538, 542 (Wyo.1993) (*quoting Osborne v. State*, 806 P.2d 272, 277 (Wyo. 1991)). These four factors are weighed and balanced in light of all the relevant circumstances. *Id.*

■ The speedy trial clock, which for constitutional purposes began to run when Yung was arrested on July 23, 1992, ran for a total of 171 days before Yung's trial began on January 11, 1993. This delay is not presumptively prejudicial. *Osborne*, 806 P.2d at 277 (holding 244 days is not presumptively prejudicial, but requiring further analysis). Thus, the first factor, length of delay, neither mandates nor prohibits reversal.

■ The second factor requires us to consider the reasons for the delay. We accord less weight to delays not attributable to the prosecution. *Id.* at 278. Many delays in this case were attributable to the district court's schedule and the timetable under which the state crime lab was forced to process the forensic evidence. Defense counsel initially insisted on receiving scientific evidence from the crime lab at least thirty days prior to trial, but later withdrew this demand. After reviewing all the options with the parties, the district court set the trial for January 11, 1993. Because the delays in this case were caused by neutral factors, beyond the prosecution's control, we find no speedy trial violation under our delay analysis.

■ Although a defendant need not demand a speedy trial in order to establish a violation of the right, the question of whether

he did so, and if so when, is relevant to our inquiry. *Id.* at 278. Yung's counsel did not demand a speedy trial until December 3, 1992. At that time, a January 25, 1993 trial date had been set for over a month, however, the district court agreed to reschedule the trial for January 11, 1993. Less than vigorous assertions of the right to a speedy trial are given little weight. *Robinson v. State,* 627 P.2d 168, 171 (Wyo.1981). Because Yung failed to assert his right to a speedy trial in a vigorous and timely manner, we accord this factor little weight.

■ The final factor considered in our analysis is the degree of prejudice suffered by the defendant. "Prejudice to the defendant may consist of (1) lengthy pretrial incarceration, (2) pretrial anxiety, or (3) impairment of the defense." *Osborne,* 806 P.2d at 278. Yung argues that he suffered pretrial anxiety while "the State's witnesses wanted to go on vacation * * *." He also asserts that his age and lack of emotional maturity contributed to his pretrial anxiety. Of the three prejudice factors we identified in *Osborne,* we find pretrial anxiety the least significant. Every criminal defendant will, as a matter of course, suffer some pretrial anxiety. A conviction need not be reversed simply because a seventeen-year-old defendant was incarcerated during the holidays, regardless of how the State's witnesses spend their time.

When these factors are weighed and balanced against all the relevant circumstances, it is clear that Yung was not denied his right to a speedy trial. The length of the delay was not excessive and was attributable to neutral factors beyond the prosecution's control. Further, Yung failed to assert his right to a speedy trial in a vigorous and timely manner. Finally, there is no indication in the record that Yung was prejudiced by the delay.

### B. CONFESSION

Yung also argues that his confession should have been suppressed. In support of this contention, he argues that the officer who arrested him for criminal impersonation in Arkansas did not have probable cause to make the arrest; that he should have been re-advised of his rights pursuant to *Miranda v. State of Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) when he was questioned at police headquarters; that his confession was involuntary; and that his second confession is tainted by the first involuntary confession and must, therefore, be suppressed as fruit of the poisonous tree.

■ Yung was arrested in Arkansas for criminal impersonation. He claims that the arrest was not supported by probable cause. An officer has probable cause to arrest a suspect if, at the moment of the arrest, the officer is aware of trustworthy facts and circumstances that would lead a reasonable person to believe the suspect is committing or has committed a crime. *Rodarte v. City of Riverton,* 552 P.2d 1245, 1253 (Wyo.1976) (*quoting Beck v. State of Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964)).

■ Assumption of a false identity is an element of the crime of criminal impersonation in Arkansas. Ark.Code Ann. § 5–37–208 (Michie 1993). The officer who arrested Yung for criminal impersonation knew, when he made the arrest, that Yung was driving without a license; that he had lied about who he was; that he was carrying Bennett's wallet; and that he was driving Bennett's car. Thus, the officer was aware of circumstances that would lead a reasonable person to believe that Yung had assumed a false identity when he claimed to be Darrell Huffer. Therefore, the arrest for criminal impersonation was supported by probable cause.

■ When he was arrested, Yung was advised of his *Miranda* rights. Yung argues that because he was not re-advised of his *Miranda* rights at the police station, his confession must be suppressed. We disagree. A criminal suspect who knowingly and voluntarily waives his *Miranda* rights need not be re-advised of those rights during subsequent interrogations, so long as the initial waiver retains its efficacy. *Brown v. State,* 661 P.2d 1024, 1031 (Wyo.1983); *United States v. Nordling,* 804 F.2d 1466, 1471 (9th Cir.1986); *Stumes v. Solem,* 752 F.2d 317, 320 (8th Cir.), *cert. denied,* 471 U.S. 1067, 105 S.Ct. 2145, 85 L.Ed.2d 502 (1985); *State v. Henry,* 176 Ariz. 569, 577, 863 P.2d

861, 869 (1993). The question of whether a defendant's waiver of his *Miranda* rights retains its efficacy requires analysis of, *inter alia,* the time lapse between the warning and the interrogation, the subject matter discussed and whether other circumstances have diluted the efficacy of the original warnings. *United States v. Smith,* 679 F.Supp. 410, 412 (D.Del.1988).

On July 23, 1992, Yung was stopped for speeding at approximately 10:30 a.m. and was arrested for criminal impersonation a few minutes later. The arresting officer read him his *Miranda* rights and Yung indicated he understood those rights. Later that day, near the end of a fifty-three minute interview which began at approximately 3:00 p.m., Yung admitted killing Bennett. He said, "Okay, okay, I killed him. I shot him. I left him at the side of the road." This statement was made in response to officers' claims that they would eventually find Bennett with or without Yung's assistance. The statement was made just over five hours after Yung was given his *Miranda* warnings. Absent some indication that Yung was not aware of his rights, further warnings were not required before the 3:00 p.m. interview began. *Henry,* 863 P.2d at 869 (further warnings not required following a six-hour delay).

The second consideration is whether the focus of the investigation changed so drastically between the time the warnings were given and the interrogation at issue was conducted that new warnings were required. *Smith,* 679 F.Supp. at 412. The focus of Yung's interrogation did not change until Yung revealed that he had killed Bennett. The initial inquiry was intended to determine who Yung was, how he came into possession of Bennett's car and where Bennett was. The same basic information was sought during the 3:00 p.m. interview which culminated in Yung's confession. Because the scope of the inquiry did not drastically change between 10:35 a.m. and 3:00 p.m., there was no need to re-advise Yung of his *Miranda* rights prior to beginning that interview.

 We next consider whether the passage of five hours diluted the efficacy of the *Miranda* warnings. In *Brown,* we identified a number of factors to be considered in making this determination:

Among them are the interval of time since the accused had been advised properly of his rights; whether the interviews were part of a continuing interrogation; whether the same officer who had furnished the earlier advice to the accused of his constitutional rights also was conducting the subsequent interview; the physical circumstances surrounding the furnishing of advice as to rights and the subsequent interrogations; and the apparent intellectual and emotional state of the accused at the time he was informed of his rights and during the subsequent interrogations.

*Brown,* 661 P.2d at 1031.

The time lapse in Yung's case has already been shown not to be excessive and the scope of the interrogation did not change significantly. The fact that different officers interrogated Yung does not, standing alone, establish that the initial *Miranda* warnings had lost their efficacy. *Nordling,* 804 F.2d at 1471 (admitting a statement made to NTF agents, although local police gave the initial *Miranda* warnings). Yung was under no physical stress when he was arrested; nor was he under any physical stress when the 3:00 p.m. interview began. In fact, he was allowed to drink, eat and rest. There was no physical stress, at any time, that could have undermined the adequacy of the *Miranda* warnings given five hours earlier. Nor is there any evidence in the record of emotional or intellectual immaturity that would detract from the efficacy of the original *Miranda* warnings. We can find no basis on which the officers interrogating Yung should have been required to re-advise Yung of his *Miranda* rights before the 3:00 p.m. interview.

 Next, Yung argues that his confession was not given knowingly or voluntarily. We review the voluntariness of a confession under a totality of the circumstances test. *Roderick,* 858 P.2d at 546. A confession offends due process if the suspect's will was overborne by the police and the suspect's capacity for self-determination was seriously impaired. *Culombe v. Connecticut,* 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6

L.Ed.2d 1037 (1961). In Wyoming, coercive police tactics violate Wyo. Const. art. 1, § 6, and statements elicited pursuant to these tactics may be suppressed. *Black v. State,* 820 P.2d 969, 972 (Wyo.1991).

■ This case does not require application of the rule articulated in *Black.* Yung has presented no evidence of coercion; nor has he presented any evidence that his will was overborne. Under the totality of the circumstances, we cannot say that Yung's confession was involuntary. He knowingly and voluntarily waived his *Miranda* rights and his confession need not be suppressed.

Yung also argues that his subsequent recorded confession must be suppressed as fruit of the poisonous tree. *See Wong Sun v. United States,* 371 U.S. 471, 487–88, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963). The central premise in Yung's argument is that the subsequent confession is "burdened with the same constitutional infirmities as the first[.]" Since we find no constitutional infirmities in the first confession, we need not consider this argument.

### C. JURY INSTRUCTIONS

■ Yung challenges the propriety of several jury instructions. Yung claims the jury instructions improperly shifted the burden of proof from the prosecution to him and the district court erred when it refused to give Yung's heat of passion instruction. Jury instructions will not be ruled defective absent a showing that the instructions confused or misled the jury as to the proper principles of law and prejudiced the defendant. *Lowseth v. State,* 875 P.2d 725, 729 (Wyo.1994) (*quoting DeJulio v. Foster,* 715 P.2d 182, 186 (Wyo.1986)).

■ Yung argues that when a defendant is charged with second-degree murder and raises heat of passion as an affirmative defense, the State must prove that the killing was *not* accomplished in the heat of passion. In support of this argument, Yung cites, among other cases, *Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975). We begin our analysis by noting that heat of passion is not normally referred to as an affirmative defense. *See* Black's Law Dictionary at 60 (6th ed. 1990). In fact, in Wyoming, heat of passion is an element of the crime of voluntary manslaughter. *State v. Keffer,* 860 P.2d 1118, 1137 (Wyo.1993). Yung's apparent theory of the case is that he killed Bennett in the heat of passion and is, therefore, guilty of voluntary manslaughter rather than second-degree murder. We will refer to Yung's heat of passion defense as a defense theory rather than as an affirmative defense.

In *Mullaney,* the United States Supreme Court held that the Maine Supreme Judicial Court could not presume implied malice aforethought and require a defendant to prove, by a preponderance of the evidence, that he acted in a heat of passion in order to reduce a murder charge to manslaughter. *Mullaney,* 421 U.S. at, 688, 703, 95 S.Ct. at 1884, 1892. Under this scheme, the defendant was essentially required to disprove an element of the crime. *Id.* at 702–03 n. 31, 95 S.Ct. at 1891 n. 31.

■ *Mullaney* does not apply here because in Wyoming, the prosecution is required to prove, beyond a reasonable doubt, that the defendant acted with malice before the defendant can be convicted of second-degree murder. *Reeder v. State,* 515 P.2d 969, 971 (Wyo.1973). The prosecution must, of course, prove every element of a crime to garner a conviction. *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970).

■ Malice is an element of second-degree murder, but heat of passion is not. *Keffer,* 860 P.2d at 1137. If a defendant maliciously kills another human being, he may be convicted of second-degree murder. *Id.* at 1137–38. If, however, the defendant kills in a heat of passion, the crime is voluntary manslaughter, not second-degree murder. *Id.* at 1138. Thus, the two elements, malice and heat of passion, constitute the distinguishing factors that allow us to differentiate between second-degree murder and voluntary manslaughter. *Id.* at 1138–39. Proof of one negates the existence of the other.

■ Thus, proof of malice negates a heat of passion theory. We hold that the prosecu-

tion need not disprove a heat of passion theory in a second-degree murder case because proof that the defendant acted maliciously nullifies that theory. *Id.* Further, we find no constitutional infirmity in requiring a defendant charged with murder to establish a heat of passion theory. *Amin v. State,* 811 P.2d 255, 260 (Wyo.1991). The burden of proof was never shifted in this case. Jury Instruction Nos. 3 and 4 clearly demonstrated that the prosecution bore the burden of proving guilt beyond a reasonable doubt. Yung's argument to the contrary must be rejected.

 Yung argues that the district court improperly defined heat of passion. The district court instructed the jury:

> "Heat of passion" means such passion as naturally would be aroused in the mind of an ordinarily reasonable person in the same or similar circumstances as those in question which would cause him to act rashly, without reflection and deliberation, and from passion rather than from judgment.

Yung submitted Jury Instruction No. X, which was refused:

> YOU ARE INSTRUCTED that the term "heat of passion" is not limited to rage, anger or resentment, by [sic] may be fear, terror, or even excitement or nervousness.

Yung cites *State v. Sorrentino,* 31 Wyo. 129, 140, 224 P. 420, 423 (1924) in support of this instruction. *Sorrentino,* however, is easily distinguished. In *Sorrentino,* the court held that the defendant was guilty of no more than manslaughter when he killed a flashlight-wielding intruder who had broken into the defendant's house and was standing in the doorway leading to the defendant's bedroom. *Id.* 224 P. at 424. The court concluded that the defendant in *Sorrentino* may have been frightened, confused, or unnerved and that the jury had no right to convict him of more than manslaughter. *Id.*

The facts in *Sorrentino* have no bearing, however, on Yung's case. Yung was in control of the situation when he shot and killed Bennett. Yung was not huddled in a dark bedroom awaiting the entry of unknown in-truders. He had marched Bennett to the back of the car when he shot him. Any excitement, confusion, fright or terror that Yung may have experienced in the car will not necessarily justify or mitigate the killing that occurred outside the car while Bennett's back was turned. We hold that the standard heat of passion instruction given by the district court was a correct statement of the law and it did not confuse or mislead the jury.

When viewed in light of the foregoing analysis, the jury instructions in this case accurately stated the law. The jury instructions were neither prejudicial to Yung nor confusing to the jury. *Lowseth,* 875 P.2d at 729. We find no reversible error.

### D. Jury Review of Taped Confession

 Yung argues that the district court improperly allowed the jury unlimited review of his taped confession. He claims that the taped confession was testimony which cannot be reviewed by the jury absent court supervision. *Chambers v. State,* 726 P.2d 1269, 1276 (Wyo.1986) (holding, unequivocally, that testimonial videotape may never go to a jury for unsupervised review during jury deliberations). We reject Yung's claim because the taped confession the jury reviewed was a non-testimonial exhibit.

 The submission of non-testimonial exhibits rests within the sound discretion of the district court. *Id.* at 1275. We hold that a defendant's tape recorded confession is a non-testimonial exhibit which the jury may review during deliberations. *Stone v. State,* 745 P.2d 1344, 1349–50 (Wyo.1987). The thrust of Yung's argument is that the district court abused its discretion by not allowing Yung to argue against the jury's review of the tape. The logic of this position escapes us. Any arguments Yung could marshall against the admissibility of his confession were exhausted when his motion to suppress the confession was denied.

After losing the motion to suppress, defense counsel made a tactical decision to rely on the taped confession when he argued Yung's heat of passion theory in closing argument. This is precisely what happened in

*Stone. Id.* at 1350. Just as we found no reversible error in *Stone,* we find none here.

### E. SUFFICIENCY OF THE EVIDENCE

 Yung argues that there was insufficient evidence to support a second-degree murder conviction. Evidence is sufficient to support a conviction if, when viewed in the light most favorable to the state, that evidence supports a reasonable inference of guilt beyond a reasonable doubt. *Suliber v. State,* 866 P.2d 85, 91 (Wyo.1993) *(quoting Taul v. State,* 862 P.2d 649, 657 (Wyo.1993)). To convict Yung of second-degree murder, the prosecution was required to prove, beyond a reasonable doubt, that Yung purposely and maliciously killed Bennett. Wyo.Stat. § 6–2–104 (1988).

 Yung argues that the jury erroneously equated his anger at the time of the shooting with malice rather than passion. He further argues there is no evidence that he acted either purposely or maliciously. We disagree and see no reason why a rational and reasonable jury could not interpret the anger Yung experienced as malice. Nor do we see why that same jury could not conclude that Yung purposefully shot Bennett in the back of the head.

 The question of whether a homicide was committed in the heat of passion or purposely and with malice is a question of fact reserved for the fact finder. *Smith v. State,* 564 P.2d 1194, 1197 (Wyo.1977) *(quoting State v. Spears,* 76 Wyo. 82, 118–19, 300 P.2d 551, 566 (1956)). So long as there is evidence from which to infer guilt beyond a reasonable doubt, we will not invade the province of the jury and reach a conclusion contrary to the jury's verdict. *Suliber,* 866 P.2d at 91. Here, Yung marched Bennett to the back of the car at gun point. Yung was in control of the situation and could have driven away. However, he shot Bennett in the back of the head. We cannot say that the jury, after considering this evidence, acted unreasonably in concluding that Yung purposefully and maliciously killed Bennett. The evidence is sufficient to support the second-degree murder conviction.

### F. EXPERT TESTIMONY

One theory that Yung advanced at trial was that he matched the profile of a homosexual rape victim. In his final argument, Yung insists that the district court erred when it refused to allow expert witnesses to testify that "Yung fit the profiles of a homosexually raped adolescent." This argument is not supported by the record.

Two different witnesses detailed the characteristics of a homosexual rape victim for the jury. Those same witnesses also testified that Yung exhibited at least some of those characteristics. Thus, Yung had every opportunity to present his theory of the case.

 The district court did not, however, allow expert opinion testimony that vouched for Yung's credibility. That decision was proper. *Montoya v. State,* 822 P.2d 363, 365 (Wyo.1991). The admission or exclusion of expert testimony is a decision which lies within the sound discretion of the district court. *Betzle v. State,* 847 P.2d 1010, 1022 (Wyo.1993). These rulings will not be reversed absent a showing of clear and prejudicial abuse. *Id.* Yung has failed to demonstrate either. Therefore, we find no reversible error.

### IV. CONCLUSION

The second-degree murder conviction is affirmed. Yung was not denied his right to a speedy trial. His voluntary confession was properly admitted and the jury had every right to request a tape recorder with which to review that non-testimonial confession. The district court properly instructed the jury and did not abuse its discretion in excluding certain expert testimony. The evidence was sufficient to sustain the second-degree murder conviction and the jury verdict is, hereby, affirmed.

MACY, J., files a specially concurring opinion.

MACY, Justice, specially concurring.

I agree with the result reached by the majority opinion, but I disagree with the legal analysis used in the speedy trial portion. I believe that W.R.Cr.P. 48(b) should

be the exclusive framework we use in determining whether a defendant's right to have a speedy trial has been violated.

Instead of examining whether Yung's right to have a speedy trial was violated under W.R.Cr.P. 48(b), the majority opinion presents an extensive analysis of the four factors which we utilized to consider claimed violations of the speedy trial right when Rule 204 of the Uniform Rules for the District Courts of the State of Wyoming was in effect. When the United States Supreme Court adopted this analysis in *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), it stated:

> We do not establish procedural rules for the States, except when mandated by the Constitution. We find no constitutional basis for holding that the speedy trial right can be quantified into a specified number of days or months. *The States, of course, are free to prescribe a reasonable period consistent with constitutional standards,* but our approach must be less precise.

407 U.S. at 523, 92 S.Ct. at 2188 (emphasis added). Consistent with the suggestion in *Barker,* this Court adopted W.R.Cr.P. 48.

We have held that W.R.Cr.P. 48 is mandatory and that it provides the exclusive framework for our speedy trial analysis. *McDermott v. State,* 897 P.2d 1295, 1299–1300 (Wyo. 1995). In my opinion, we should no longer conduct a *Barker* analysis since W.R.Cr.P. 48(b) is mandatory. Any constitutional challenge made after the adoption of the rule should be made against the rule itself as the constitutional guarantees addressed in the *Barker* analysis are included within and superseded by the rule.

In the case at bar, Yung was arraigned on August 21, 1992. His trial was tentatively scheduled for December 14, 1992, but it was continued until January 11, 1993—143 days following his arraignment.

W.R.Cr.P. 48(b) provides in pertinent part:

(b) *Speedy trial.*

. . . .

(4) Continuances not to exceed six months from the date of arraignment may be granted by the trial court as follows:

(A) On motion of defendant supported by affidavit;

(B) On motion of the attorney for the state or the court if:

(i) The defendant expressly consents;

(ii) The state's evidence is unavailable and the prosecution has exercised due diligence; or

(iii) Required in the due administration of justice and the defendant will not be substantially prejudiced; and

(C) If a continuance is proposed by the state or the court, the defendant shall be notified. If the defendant objects, the defendant must show in writing how the delay may prejudice the defense.

In conducting a W.R.Cr.P. 48 analysis in this case, we must determine the reason for the continuance. During an October 26th hearing on various motions, Yung's counsel inquired about the trial setting. The State remarked that December or early January were realistic times. Yung's counsel did not object to the suggested time period, but he mentioned that he hoped the trial would be scheduled for the middle of December. He also stated that he wanted to have at least thirty days to review the results from the crime lab and have his own tests performed.

The trial court heard more motions on November 4th and 5th, at which time the parties discussed Yung's motion for a date certain. Taking into account that the results were not available from the crime lab and that the scientific evidence should be provided thirty days prior to the trial date, the State suggested that the trial be held in early January. Yung's counsel requested that the trial be scheduled for December 14, 1992, but the State countered that there would not be enough time before December 14th to provide the scientific evidence. Furthermore, the trial court had a three-week trial which had been scheduled to commence in early December. The trial court, therefore, set the case for January 25, 1993. Yung's counsel did not object at that time to the trial setting.

Yung subsequently filed a demand on December 3, 1992, for a speedy trial. At a December 4th hearing, he objected to the

January 25, 1993, trial date, asserting that the 120–day time period provided for in W.R.Cr.P. 48(b)(2) would expire on December 21st, and requested that the trial be scheduled for December 14, 1992. The State argued that Yung's right to have a speedy trial was not being violated by the January trial date because W.R.Cr.P. 48(b)(4) permitted the extra time in this case. In support of that argument, the State claimed that another case was scheduled to go to trial that week; that Yung's counsel did not object when the January date was scheduled; that the crime lab had arranged the testing so that it would coincide with the January 25, 1993, trial date and, thus, had not planned to have the tests finished until December 25, 1992; and that the out-of-town witnesses had made plans according to the January 25th trial date. Because the trial court was concerned about a possible speedy trial violation, it agreed that it would allow Yung's case to begin on December 14, 1992, in the event the case which was already scheduled for that date did not commence.

On December 7, 1992, the State filed a letter and a motion in which it detailed the unavailability of critical evidence which was necessary for the presentation of its case. The State reemphasized that, because of the trial court's prior trial setting of January 25th, the crime lab and out-of-town witnesses had made all their plans accordingly and that much of the State's evidence would be unavailable if it were required to go to trial on December 14th. The trial court concluded that, "in order to allow a level field for both sides," the State should be allowed to go beyond the 120 days and ordered that the trial would remain scheduled for January 25, 1993. After more discussion, the trial was rescheduled for January 11th.

I conclude that the continuance of Yung's trial fell within the specified types of continuances which are permitted by W.R.Cr.P. 48(b)(4). The parties did not object to the January 25th trial setting, and the State and its witnesses made their plans accordingly. When Yung subsequently claimed that such a delay would violate his right to have a speedy trial and that the trial setting should be moved up, the State's evidence was not available and would not be available before January 25, 1993.

I also conclude that Yung's defense was not prejudiced as a result of the continuance. Yung claimed that he was prejudiced because he suffered from pretrial anxiety. He did not, however, show that any witness became unavailable, that evidence was not produced, or that any witness's memory was impaired by the delay. Nor did Yung show that the prosecutor was using the continuance in order to gain a tactical advantage over him. The trial court decided on the January trial date in an effort to assure that all the evidence and witnesses would be available for the trial and that Yung would have a fair opportunity to thoroughly review the State's evidence.

The continuance did not exceed six months from the date of the arraignment, it was granted for reasons which are permitted by W.R.Cr.P. 48(b)(4), and Yung's defense was not prejudiced by the continuance. Yung's right to have a speedy trial, therefore, was not violated.